**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF TEXAS**

**AUSTIN DIVISION**

| | | |
|---|---|---|
| REX REAL ESTATE I, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO.:  1:19-cv-00696-RP |
| | ) | |
| v. | ) | |
| | ) | |
| REX REAL ESTATE EXCHANGE INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## [PROPOSED] ORDER GRANTING DEFENDANT REX REAL ESTATE EXCHANGE, INC.'S  MOTION FOR JUDGMENT AS A MATTER OF LAW

Plaintiff Rex Real Estate I, L.P. ("Plaintiff") accuses Defendant Rex Real Estate Exchange, Inc. ("Defendant") of trademark infringement, trademark dilution, and unfair competition under federal, state, and common law.  Beginning on April 8, 2022, this case came before this Court for a jury trial.  Plaintiff presented its case on April 8, 11, and 12, 2022, calling 7 witnesses: (1) Sherese Glendenning; (2) Matthew Kiran; (3) Jack Ryan; (4) Robert Cheetham (by deposition); (5) Danielle Gervasi; (6) Rex Glendenning; and (7) Jeffery Stec.  The Court admitted 521 exhibits into evidence.

After Plaintiff rested on the afternoon of April 12, 2022, pursuant to Federal Rule of Civil Procedure 50(a), Defendant moved orally for Judgment as a Matter of Law on three grounds: (1) Plaintiff had not met its burden to prove valid trademark rights; (2) Plaintiff had not met its burden to prove that there is a likelihood of confusion caused by Defendant's use of its "Rex" trademarks; and (3) Plaintiff had not proven actual damages or that Defendant had made any profits attributable to the alleged infringement of Plaintiff's marks.  The Court heard oral argument on Defendant's motion on the afternoon of April 12 and again on the morning of April 13.

On April 13, 2022, the Court orally granted Defendant's Motion for Judgment as a Matter of Law and dismissed the jury. The Court requested that Defendant file a written motion along with a proposed order, which Defendant filed on May 5, 2022. The Court now issues this written order, granting Defendant's Motion for Judgment as a Matter of Law.

## I.    Background

### A.    Plaintiff

Plaintiff is a commercial real estate company owned and founded by Rex and Sherese Glendenning which "specializes in the acquisition and sale of commercial, investment and development properties . . . in the North Texas growth corridor." D-142; *see also* T1[1] 125:10-13, 126:19-22; T3 73:8-16, 123:14-19. Plaintiff did not exist as a corporate entity until March 23, 1999. The Glendennings operated the business and used "Rex" before Plaintiff existed. There was no evidence at trial that the Glendennings assigned any rights to the "Rex" marks to Plaintiff. P-17; T1 276:24-279:2.[2]

Plaintiff is named after Mr. Glendenning. The Glendennings originally named it "Rex Glendenning Real Estate," but dropped the "Glendenning" because it was "too long." T1 127:25-128:5; *see also* P-6; D-6. In 2018 and 2019, when Plaintiff sought to cancel Defendant's "Rex" trademarks, it represented to the federal government at least three times that its "Rex" marks descriptively refer to Mr. Glendenning and are recognized to do so by consumers. *See* D-286 at -

---

[1] T1 refers to "Trial Transcript Day 1." Trial Transcript citations are similar throughout.

[2] If an "applicant [for a trademark] does not own the mark on the application filing date, the application is void." Trademark Manual of Examining Procedure § 1201.02(b). "An application filed in the name of the wrong party is void and cannot be corrected by amendment." *Id.* § 1201.02(c). As Plaintiff never received an assignment of ownership of the "Rex" mark, its trademark applications are void, and this error cannot be corrected. *See Huang v. Tzu Wei Chen Food Co.*, 849 F.2d 1458, 1460 (Fed. Cir. 1988) (affirming holding that trademark registration application was void because it was filed in the name of a person who did not own the mark at the time of filing).

6281, -6320, -6391; T3 113:21-116:14 (representing that Plaintiff's "Rex" mark "is the same as the name or identity of a person, namely, Rex Glendenning" and that consumers recognize the mark as "point[ing] uniquely and unmistakably to the person named or identified, namely, Rex Glendenning."). It did so relying on a declaration from Mr. Glendenning, who instructed his attorneys to make these representations. T3 116:20-23; D-286 at -6281, -6320, -6391, -6423.

As emphasized in the documents it submitted to the USPTO to secure its trademark registrations, Plaintiff is a commercial and investment real estate broker. D-292 at -7427, -7428 (Plaintiff's website: "REX Real Estate is dedicated to understanding the investment needs of each client and matching them with the right investment."); D-296 at 26-31 (Plaintiff's website describing its specialization in commercial and investment properties); *see also* T1 152:13-21 (Mr. Glendenning is "the number-one investment broker" in the DFW area); T1 249:24-255:2 (Ms. Glendenning admitting that all of the publications about Plaintiff that she showed to the jury involved commercial and investment real estate); T3 73:12-19 (Plaintiff's receptionist admitting that "the first thing that came to mind" about Plaintiff is that it is a "commercial real estate company"); T3 121:14-126:5 (Mr. Glendenning admitting that the evidence of use of the "Rex" trademark he submitted to the USPTO describes Plaintiff as a commercial and investment real estate business).

Plaintiff has never bought or sold a property outside of Texas and is not licensed to do so. T3 at 126:6-12; P-246 (closed transactions concentrated within 13 counties in Texas, primarily in DFW). Although it claimed in this litigation to handle "residential" real estate, the list of "residential" transactions it provided in discovery averaged $6.2 million and 242 acres, and were sold almost exclusively as investment properties to corporate entities. P-246. Plaintiff identified at trial only two transactions involving the purchase or sale of an individual home. Cross-examination revealed that one was the home of the Glendennings' daughter, and the other a 20-acre farm and ranch. P-168; P-169; T1 257:5-258:1. As of the trial, Plaintiff's website listed six properties described as "single family" homes. In reality, each was a plot of undeveloped land,

-3-

ranging from 5 to over 1000 acres.  D-550; T2 65:4-72:10.

Plaintiff's marketing efforts largely focus on entertaining its wealthy commercial and investment clients.  Plaintiff's long time sales agent Matthew Kiran distinguished Plaintiff's business from "high tech" "algorithms" and "matching," describing it instead as "high touch": "We want to do business face-to-face, people to people.  That's what we do."  T2 23:24-24:3. More than 75% of its claimed "advertising" and "marketing" expenditures—namely the lease for a corporate suite at the Dallas Cowboys stadium, associated food and beverage expenses, and hosting an annual "dove hunt"—were for entertaining its client base at private events.  D-26 ($3.5/$4.6 million attributable to a corporate suite at AT&T Stadium); P-115; P-116; T1 265:22-266:23; T3 132:24-133:16.

Plaintiff presented some evidence of advertising and press coverage, but it was almost all confined to local newspapers and high school football sponsorships in North Texas.  P-105; P-206; P-12; P-13; P-23; P-19; P-167; P-25; P-202; P-91; P-92; T1 231:21-236:8; 237:22-239:24. Plaintiff also presented evidence of its revenues.  P-255; T1 228:1-12.  But it presented no evidence that its asserted "advertising" or "marketing" caused consumers to uniquely associate "Rex" as a brand name for its services.  While it proffered a survey to try to show likelihood of confusion (addressed *infra* at 18-19), it did not proffer one to try to show secondary meaning.  To the contrary, its expert conceded that its "Rex" marks are not "immediately recognizable," "top of mind," or "recognized by a majority of the marketplace." T3 160:20-161:5; 218:16-20.

### B.    Defendant

Defendant is a technology company seeking to disrupt the residential real estate market through artificial intelligence and big data.  T2 140:21-24, 148:13-16, 151:20-154:22, 223:5-224:1, 225:6-228:7.  Defendant offers an online platform and in-person service where homeowners list, discover, and purchase single family homes without the high fees typically associated with real estate transactions.  T2 140:21-24, 223:5-224:1, 225:6-228:7.  It operates in fifteen states across the country and the District of Columbia.  T2 260:24-261:3.  Defendant's business is focused on sales

to middle-class Americans seeking a home to live in.  T2 227:7-19; 228:3-16; 264:6-10; T3 31:10-18.  Its historical average sale price of a home in Texas is approximately $365,000, and the average lot size is 0.38 acres.  T2 227:7-228:2; P-264.

Unlike Plaintiff, Defendant is "high tech, low touch."  T2 262:18-263:6.  It focuses most of its marketing on online advertising.  T2 140:25-141:2.  The vast majority of its marketing and advertising budget goes toward placing paid search engine advertisements on websites such as Google and banner ads on third-party websites.  T2 153:6-16, 207:6-8; D-350; D-318.

Defendant's CEO, Jack Ryan, came up with the name "Rex" in 2012 or 2013 before he or his lawyers were aware of Plaintiff.  T2 254:19-255:2.  He chose the name based on his experience with the stock exchange to create the impression of single family homes exchanging digitally in the cloud.  T2 137:25-138:03, 230:13-231:24.  The "R" stands for "real estate" and the "EX" stands for "exchange."  *Id.*  When Ryan formed Defendant, he hired a trademark lawyer to perform a clearance search for other companies that had a "Rex" name.  T2 236:22-237:16.  The search turned up many other third parties using the "Rex" names; while Plaintiff was among them, Ryan never focused on it.  *Id.*; *see also* T3 16:22-17:3; T2 237:12-16.  In order to safely use the name, Defendant acquired all trademark rights and associated goodwill from third party Azavea, Inc., including a 2006 federal registration for "Rex" with a 2002 priority date for "[c]omputer software for use in search and displaying real estate information on a global computer network."  D-70; D-535; T2 242:10-17.  That description matches what Defendant does.  T2 240:23-241:17; 244:1-21; 246:8-247:6.  In 2017, Defendant also filed two more "Rex" trademark applications, including for computer software for facilitating real estate transactions, real estate marketing and advertising services, and operating online marketplaces for buying and selling real estate.  D-537; D-259; T2 250:15-258:9; T3 31:19-32:17.  One is registered and the other has passed USPTO review but is blocked pending this litigation.  T2 255:16-19; D-295.

/ / /

/ / /

### C.  Other "Rex" Entities

There are hundreds of people and entities using a "Rex" name across the country, including in real estate and related fields.  By Plaintiff's own count, there are 147 entities registered to do business in Texas with "Rex" names that are classified as "in use," 23 of which are "involved in real estate."  D-334; P-270.   Plaintiff also admitted that in Texas, there are 28 active licensed real estate brokers, 34 active licensed real estate sales agents and 2 active licensed real estate LLCs with "Rex" names.  P-275; D-314-317.  And it admitted based on its review of Realtor.com that there are 233 realtors nationwide with the name "Rex."   P-271; D-324.   Unsurprisingly, there are hundreds of "Rex" trademarks registered with the USPTO, including in real estate and related fields.   D-466; P-273; P-274.

## II.  Legal Standard

Under Federal Rule 50(a), "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue," the court may grant judgment as a matter of law against the party "on a claim . . . that . . . can be maintained or defeated only with a favorable finding on that issue."  Fed. R. Civ. P. 50(a).  The decision to grant a Rule 50 motion is "a conclusion of law based upon a finding that there is insufficient evidence to create a fact question for the jury."  *Omnitech Int'l, Inc. v. Clorox Co.*, 11 F.3d 1316, 1323 (5th Cir. 1994).

## III.  No Reasonable Jury Could Find That Plaintiff Had Protectable Rights In Its "Rex" Trademarks

Plaintiff has not established protectable trademark rights in the "Rex" mark.  To be protectable, a trademark must be "distinctive" in relation to the goods or services to which it is applied such that it functions as a unique identifier or brand.  *Bank of Tex. v. Commerce SW, Inc.*, 741 F.2d 785, 787 (5th Cir. 1984).  Marks are classified in categories of increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful.  *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 240 (5th Cir. 2010).  Only the latter three are "inherently

distinctive" marks.  *Id.*  Descriptive marks "cannot be protected unless they acquire distinctiveness through secondary meaning."  *Test Masters Educ. Servs., Inc. v. Robin Singh Educ. Servs., Inc.*, 799 F.3d 437, 445 (5th Cir. 2015), *rev'd on other grounds*, 2015 WL 13768849 (5th Cir. Oct. 22, 2015).

### A.    Plaintiff's "Rex" Marks Are Descriptive

Plaintiff's marks REX and REX REAL ESTATE are derived from the first name of one of Plaintiff's founders.  Rex Glendenning repeatedly admitted that the "Rex" in Plaintiff's marks refers to Rex Glendenning.  T3 at 108:3-14, 117:77-20 ("When you made the decision to adopt the name Rex Real Estate, you did it because you're Rex and you are in the real estate business, correct? A. That is what it says."); *see also* T2 at 72:11-16.  In at least three separate submissions to the USPTO from November 20, 2018 through January 7, 2019 (after this lawsuit began in June 2018), Plaintiff represented that its "mark 'REX' is the same as the name or identity of a person, namely, Rex Glendenning" and that it would be "recognized by customers in that it points uniquely and unmistakably to the person named or identified, namely, Rex Glendenning."  D-286 at -6281, -6320, -6391, -6423; T3 112:5-23, 113:21-116:19.  Each submission cited to a declaration from Mr. Glendenning.  D-286 at -6281, -6320, -6391, -6423.  When confronted with these submissions at trial, Mr. Glendenning testified that he worked with his lawyers to make sure the statements were truthful and accurate.  T3 111:4-8.  Based on these admissions, no reasonable jury could find anything other than that Plaintiff's marks are personal name marks.

"Personal names—both surnames and first names—are generally regarded as descriptive terms that require proof of secondary meaning." *Amy's Ice Creams, Inc. v. Amy's Kitchen, Inc.*, 60 F. Supp. 3d 738, 747 (W.D. Tex. 2014); *see also* 2 MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 13:2 (4th ed.) ("MCCARTHY") ("Personal names are placed by the common law into that category of noninherently distinctive terms which require proof of secondary meaning for protection.").  Accordingly, the Court concludes that the marks are not inherently distinctive, but rather are descriptive and thus require Plaintiff to prove the marks have achieved secondary

meaning. *See Bd. of Supervisors for LSU v. Smack Apparel Co.,* 550 F.3d 465, 476 (5th Cir. 2008).

Plaintiff argued at trial that its marks are inherently distinctive because it owns trademark registrations. This argument is unconvincing. Trademark registrations at most provide a rebuttable presumption of validity, and that presumption does not apply here because proof of secondary meaning is not required to register first names under either the Lanham Act or the Texas Business and Commerce Code. *See* 15 U.S.C. § 1052(e)(4); TEX. BUS. & COM. CODE §16.051(a)(6); Trademark Manual of Examining Procedure § 1211; 2 MCCARTHY §§ 13:2, 13:28 . Thus, the trademark office has never examined whether Plaintiff's "Rex" marks are descriptive or whether Plaintiff has achieved secondary meaning for them. If the presumption ever applied, it has been rebutted by the overwhelming evidence that Plaintiff uses "Rex" descriptively.

Plaintiff also argued at trial that its marks are inherently distinctive, not descriptive, because the word "Rex" means "king" in Latin. The evidence at trial did not support that Plaintiff's "Rex" marks were meant as a reference to "king." Even if a personal name trademark has a dictionary definition or other meaning, what matters is how the purchasing public views the mark. *See In re Nelson Souto Major Piquet*, 1987 TTAB LEXIS 40, at *4-5 (T.T.A.B. 1987). Plaintiff not only represented to the USPTO that its "Rex" marks are meant as a reference to Mr. Glendenning and are in fact viewed as such by the public, but at trial Mr. Glendenning admitted the same. T3 108:3-14 (Mr. Glendenning claiming "the public at large associates the term Rex with [me]"). In contrast, Plaintiff presented no evidence that consumers view "Rex" as a reference to its Latin translation. *See In re Rath*, 2004 TTAB LEXIS 18, at *8 (T.T.A.B. 2004) (surname mark not distinctive where dictionary meaning of name was not the ordinary meaning).

Finally, Plaintiff argued at trial that its 2015 trademark registration for "Rex" with the crown logo is "incontestable" and therefore "must be considered either nondescriptive or to have acquired secondary meaning." ECF No. 216-1 at 2. Plaintiff's crown logo mark is not incontestable. A trademark may become incontestable only if the owner files an affidavit attesting that (1) the mark has been in continuous use for at least five years, and (2) there is no proceeding

pending in court or the USPTO involving "the owner's claim of ownership of such mark" or "the owner's right to register the same or to keep the same on the register." 15 USC § 1065. Plaintiff's crown logo was not registered until January 13, 2015, and was thus not even theoretically eligible for incontestable status until January 13, 2020. At that point, Defendant had *already* challenged the validity of Plaintiff's "Rex" marks on the basis of descriptiveness, including in its October 21, 2019 Motion for Summary Judgment. *See* ECF No. 101. Thus, the parties' dispute concerning the validity of Plaintiff's "Rex" marks predates any claimed incontestable status. Moreover, Plaintiff's affidavit of incontestability (filed on January 20, 2020) was false when made, since at the time Plaintiff signed and submitted the affidavit, its ownership in, and the registrability of, its "Rex" mark was the subject of this court action. *See* D-292 at 7414-7424 (Plaintiff's affidavit). Plaintiff's assertion of incontestability is therefore invalid. *Skippy, Inc. v. CPC Int'l, Inc.*, 674 F.2d 209, 216 (4th Cir. 1982) (vacating incontestability where affidavit was false when made).

### B.     Plaintiff Did Not Prove Secondary Meaning

Because Plaintiff's marks are descriptive, they are invalid and unenforceable unless Plaintiff proves they have achieved secondary meaning. *Bd. of Supervisors,* 550 F.3d at 476. A trademark has achieved secondary meaning where the primary significance of the trademark to the general public is as the unique identifier of a particular product or service, rather than as a descriptive term. *See id.*; *Sec. Ctr., Ltd. v. First Nat'l Sec. Ctrs.*, 750 F.2d 1295, 1301 (5th Cir. 1985). As Plaintiff sought a national ban on Defendant's use of the "Rex" mark, Plaintiff was required to demonstrate that its marks have achieved secondary meaning nationwide. *See Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 576 & n.7 (5th Cir. 2005) (where plaintiff claims nationwide rights to descriptive mark, he must demonstrate that "the American public" identifies mark uniquely with his company); *see also Robin Singh Educ. Servs. v. Excel Test Prep, Inc.*, 274 F. App'x 399, 405-06 (5th Cir. 2008); *Tana v. Dantanna's*, 611 F.3d 767, 776 (11th Cir. 2010). The burden on a plaintiff to establish secondary meaning is "substantial and requires a high degree of proof." *Test Masters*, 428 F.3d at 567.

No reasonable jury could find that Plaintiff demonstrated secondary meaning across Texas, much less nationwide. Plaintiff did not present any evidence at trial that consumers associate "Rex" uniquely as its brand. To the contrary, it admitted to hundreds of other users of "Rex," and its own expert conceded its marks are not "immediately recognizable," "top of mind," or "recognized by a majority of the marketplace." T3 160:20-161:5, 218:16-20.

Plaintiff's failure to conduct a survey is an "insurmountable" obstacle here. *Sec. Ctr.*, 750 F.2d at 1301; *see also Amazing Spaces*, 608 F.3d at 248 ("We have consistently expressed a preference for 'an objective survey of the public's perception of' the mark at issue."); *Vision Center v. Opticks, Inc.*, 596 F.2d 111, 119 (5th Cir. 1979) (same); *Unified Buddhist Church of Vietnam v. Unified Buddhist Church of Vietnam*, 838 F. App'x. 809, 814 (5th Cir. 2020) ("[I]n a borderline case where it is not at all obvious that a designation has been used as a mark, survey evidence may be necessary to prove trademark perception[.]") (citation omitted).

Instead of a survey, Plaintiff relied on its revenues, local advertising/marketing efforts, local newspaper articles, and the length of time the Glendennings have been in business to attempt to prove secondary meaning. But that information is insufficient as a matter of law "absent supporting evidence demonstrating how [it] impart[s] secondary meaning to the mark[.]" *Half Price Books, Records, Magazines, Inc. v. Barnesandnoble.com, LLC*, 2003 U.S. Dist. LEXIS 24254, at *13 (N.D. Tex. Aug. 15, 2003) ("unadorned" dollar figures "cannot serve as a basis for secondary meaning"). The critical question "is not the extent of [Plaintiff's] efforts, but their effectiveness in altering the meaning of the term to the consuming public" – yet Plaintiff adduced no such evidence at trial. *Amazing Spaces*, 608 F.3d at 248; *Unified Buddhist*, 838 F. App'x at 813-814 (promotional materials and articles which "contain little information about the public's perception . . . of the asserted marks" insufficient without "evidence demonstrating their significance."); *Half Price*, 2003 U.S. Dist. LEXIS 24254, at *13-14 ("considerable sums expended in promoting its product" and "newspaper and magazine articles" insufficient where plaintiff provided "no evidence demonstrating how its promotional efforts have altered public perception to

the degree that the mark . . . is associated with [plaintiff]").

Instead, Plaintiff's trial presentation confirmed that its business and advertising are geographically limited. By its own account, the company focuses on the "North Texas growth corridor" (D-142); maps from Plaintiff's website show the handful of counties in Texas that Plaintiff purports to serve. D-78; D-79; D-298. Plaintiff's advertising, marketing, and press coverage is overwhelmingly limited to the Dallas/North Texas area. P-105; P-23; P-167; P-25; P-175; P-177; P-176; P-91; P-206; P-12; P-13; P-19; P-202; P-92. Plaintiff does not "advertise, put signage up, [or] run ads in the paper" outside of Texas (T3 146:5-24); "only solicit[s] and [does] business in the state of Texas" (T3 91:8-18; *see also id.* 142:6-143:2; T2 56:9-18); and does not actively solicit business outside of Texas. T3 146:18-21.

Plaintiff introduced evidence that it had a booth at a conference in Las Vegas (T1 236:25-237:19); has a donor brick at AT&T Stadium in Dallas (P-25); maintains a website that it does not use to "actively solicit" business (T3 91:8-18); and has handled transactions in Texas for persons located in other states (T1 156:6-16; 226:14-22). But it provided no evidence that these efforts have altered the meaning of the "Rex" marks to consumers nationwide. To the contrary, the lion's share of its claimed expenditures were instead for private client entertainment at AT&T Stadium and its annual dove hunts – none of which has anything to do with developing national brand recognition among the consuming public. *See* T1 265:22-266:23; T3 132:24-134:16.

Plaintiff's reliance on claimed instances of consumer confusion to try to show secondary meaning also fail. Under any circumstances, scattered incidents of confusion do not show secondary meaning. *Half Price*, 2003 U.S. Dist. LEXIS 24254, at *14. Plaintiff's evidence in particular *undermined* any assertion of secondary meaning. Its witnesses admitted that the majority of instances of alleged "confusion" occurred when people contacted Plaintiff by mistake and *had no idea who it was*. T1 260:10-20; 261:5-11; T3 82:3-6, 84:12-15. In other words, if consumers associate the name "Rex" with anyone, it is not the Plaintiff. The scores of other "Rex"s registered to do business with "Rex" names (*see supra* pp. 6) also belie any suggestion that purchasers

-11-

identify "Rex" uniquely with Plaintiff. *See Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 13 (5th Cir. 1974); *Flynn v. Health Advocate, Inc.*, 169 F. App'x 99, 101 (3d Cir. 2006).

### C.     Plaintiff Failed to Demonstrate Secondary Meaning As of 2002

Shortly after it was founded, Defendant acquired rights to the "Rex" trademark from third party Azavea. *See* D-286; D-070; D-535; T2 242:10-17; 255:9-15. Azavea used the mark for an online real estate service that matched homebuyers with houses based on where they wanted to live and what they could afford. T2 243:18-244:21; T3 37:6-38:16. Because Defendant offers a more advanced version of Azavea's "Rex" service, it properly claims rights to the "Rex" mark dating back to Azavea's 2002 priority date. *See* T2 152:20-153:5, 239:19-244:21, 246:8-247:6; *Visa, U.S.A., Inc. v. Birmingham Trust Nat'l Bank*, 696 F.2d 1371, 1376 (Fed. Cir. 1982); 3 MᴄCᴀʀᴛʜʏ § 18:15 ("All courts follow the rule that after a valid assignment, the assignee acquires all of the legal advantages of the mark that the assignor enjoyed, including priority of use."). No reasonable jury could find that Plaintiff achieved nationwide secondary meaning as of now, much less as of 2002, as required to establish senior rights in "Rex." *See PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 564 (2d Cir. 1990); 2 MᴄCᴀʀᴛʜʏ § 16:34.

### IV.     No Reasonable Jury Could Find A Likelihood Of Confusion From Defendant's Use Of Its "Rex" Trademarks

To prove infringement, a trademark holder must show "a likelihood of confusion in the minds of potential consumers as to the source, affiliation, or sponsorship" of the alleged infringer's products or services. *Springboards to Educ., Inc. v. Hous. Indep. Sch. Dist.*, 912 F.3d 805, 811-12 (5th Cir. 2019) (citation omitted). "A 'likelihood of confusion' means that confusion is not just possible, but probable." *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 483 (5th Cir. 2004) (citation omitted).

Eight "digits of confusion" inform the analysis:

(1) "the type of mark allegedly infringed"; (2) "the similarity between the two marks"; (3) "the similarity of the products or services"; (4) "the identity of the retail outlets and purchasers"; (5) "the advertising media used"; (6) "the defendant's intent"; (7) "any evidence of actual confusion"; and (8) "the degree of care exercised by potential purchasers."

*Springboards*, 912 F.3d at 812.  A review of the digits shows no likelihood of confusion.

### A.      Type Of Mark Allegedly Infringed

The first digit, strength of the mark, addresses two factors:  (1) the mark's position along the distinctiveness spectrum, and (2) its standing in the marketplace.  *Springboards*, 912 F.3d at 814. With respect to the first factor, even if Plaintiff's "Rex" marks are protectable, they are weak because they are descriptive, and in light of the crowded field of "Rex" users.  *See supra* pp. 6.

With respect to the second factor, when the same or a similar mark is commonly used by multiple entities, consumers learn to distinguish among them.  *See Springboards*, 912 F.3d at 815; *Montalto v. Viacom Int'l, Inc.*, 545 F. Supp. 2d 556, 559 (S.D. Miss. 2008).  Given the many other "Rex" and "Rex"-related marks, each is accorded only narrow protection.  The weakness of Plaintiff's mark, combined with the parties' distinct markets, marketing channels, and consumers, negates any possibility of confusion.  *See Citizens Nat'l Bank of Meridian v. Citizens Bank of Phila.*, 157 F. Supp. 2d 713, 719 (S.D. Miss. 2001) (granting summary judgment "in view of the weakness of the Citizens trade name, and the absence of any countervailing circumstances"), *aff'd* 2002 U.S. App. LEXIS 29669, *5 (5th Cir. Apr. 19, 2002) ("Extensive use of a word, particularly in a similar industry, reduces the likelihood of confusion among consumers and drastically weakens a mark.").

### B.      Similarity Between The Plaintiff's and Defendant's Marks

The second digit, similarity of the marks, examines their overall impression in the marketplace.  "The use of identical dominant words does not automatically equate to similarity between marks."  *Springboards*, 912 F.3d at 815.  While both parties use "Rex" marks, their logos are visually distinct.  Plaintiff's "Rex Real Estate" logo has a traditional font and incorporates a crown (*see* P-1); Defendant uses an orange "REX" in modern font with design elements

incorporating a house and an hourglass.  T2 235:12-236:15; D-278 (Defendant's logo in top left corner).  Consumers are unlikely to confuse the Parties' dissimilar logos.

### C.      Similarity Of The Products And Services And Identity Of The Retail Outlets And Purchasers

The third and fourth digits, the similarity of the products or services and the identity of the parties' customers, also weigh against confusion.  The parties offer very different services to very different customers.  Defendant is an online technology company using artificial intelligence and big data to disrupt the residential real estate market.  *See supra* pp. 4.  It sells single family homes through its website.  Its value proposition is to reduce costs normally paid in commission while still providing excellent service.  T2 265:2-267:01; T2 244:22-246:7; D-225.  Defendant's customers are middle-class Americans; the average price of a home bought or sold in Texas through Defendant's platform is approximately $365,000; the average lot size is 0.38 acres.  T2 227:7-228:16, 264:6-10; T3 31:10-18; P-264.  Defendant focuses exclusively on consumers purchasing homes to live in and has no capacity to sell commercial properties, subdivisions, or undeveloped acreage.  *Id.*  T2 at 228:3-16, 258:10-17, 259:2-260:23, 263:7-264:23.

Plaintiff, by contrast, "specializes in the acquisition and sale of commercial, investment and development properties" in the "North Texas growth corridor."  D-142.  Plaintiff does not focus on single family homes.  At trial, it introduced evidence of just two sales involving single family homes.  The properties that Plaintiff claims are "single family" on its website are actually undeveloped lots, large residential subdivisions, and mixed-use developments.  *See, e.g.*, D-550; T2 65:13-72:10.  Plaintiff's average sales price for "residential" properties is over $6 million; its average lot size is 242 acres; and 95% of its sales are to corporate entities.  P-246.  Plaintiff sells its properties through traditional listings.  It does "business face-to-face, people to people."  T2 24:2-3.

The substantial differences in the parties' markets, marketing channels, and customers militate against a finding of confusion.  *See Firefly Dig., Inc. v. Google Inc.*, 817 F. Supp. 2d 846, 864 (W.D. La. 2011).

### D.    Advertising Media Used

The fifth digit, the advertising media used, also weighs against confusion.  Plaintiff's marketing focuses on private, in-person entertainment.  Over 75% of its "marketing" and "advertising" expenditures relate to leasing and entertaining clients at a luxury box at AT&T Stadium in Dallas.  *Supra* at pp. 4.  The remainder of its marketing and advertising almost exclusively focuses on publications local to Dallas and Fort Worth, community organizations, high school and college football in the Dallas area, and local signage (*see supra* pp. 4), and does not incorporate digital marketing.  T3 132:4-23; D-26 (between 2001 and 2018, Plaintiff spent $87.49 on Google advertising).  Defendant is "exactly the opposite."  T2 261:13-263:6.  As a big data technology company, Defendant focuses on online advertising and marketing, including through paid Google advertisements.  *See Tex. Dairy Queen Operators Council v. Feed Store, Inc.*, 1986 WL 15609, at *5 (N.D. Tex. Oct. 8, 1986) (digit cut against confusion where one party had extensive advertising and the other "only advertises in the local newspapers which cover the areas in which their five stores are located"); *Firefly*, 817 F. Supp. 2d at 864 (similar).

### E.    Defendant's Intent

The sixth digit, defendant's intent, also favors Defendant.  Jack Ryan selected Defendant's name in 2012 or 2013, before he or Defendant's attorneys were even aware of Plaintiff, as a shorthand reference to "Real Estate Exchange."  T2 84:25-85:4, 230:13-231:24.  His idea – totally unrelated to Plaintiff – was to create an impression of residential homes exchanging digitally in the cloud.  T2 230:13-231:24, 254:19-255:2.  Shortly after its founding, Defendant had its attorneys run trademark clearance searches and it acquired rights to the "Rex" mark from Azavea – all showing that Defendant is a responsible trademark citizen.  D-70; D-535; T2 236:22-237:11.  No evidence suggests that Defendant intentionally used the "Rex" mark because of Plaintiff.

### F.    Evidence of Actual Confusion

Plaintiff introduced evidence of alleged confusion regarding the Parties' use of the "Rex"
mark.  This evidence does not weigh in favor of a finding of likelihood of confusion in this case.
In assessing the seventh digit, actual confusion, "[t]he relevant inquiry is whether use of the mark
produces confusion in potential customers."  *Citizens Nat'l*, 2002 U.S. App. LEXIS 29669, at *8;
*see also Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 457 (5th Cir. 2017)
("Not all confusion counts:  evidence of actual confusion must show more than a fleeting mix-up of
names; rather it must show that the confusion was caused by the trademarks employed and it
swayed consumer purchases.") (internal quotation omitted); *First Keystone Fed. Sav. Bank v. First
Keystone Mortg., Inc.*, 923 F. Supp. 693, 704 (E.D. Pa. 1996) ("Generalized confusion is not what
courts look to, but rather, evidence of confusion in mistaken purchasing decisions.").
Communications not involving potential customers seeking to do business with the plaintiff do not
establish actual confusion.  *See Citizens Nat'l*, 157 F. Supp. 2d at 721  (no confusion where
majority of 200 misdirected communications were either defendant's existing customers or not
customers at all); *Sun Banks of Fla., Inc. v. Sun Fed. Savings & Loan Ass'n*, 651 F.2d 311, 319 (5th
Cir. 1981) (discounting evidence of confusion where none came from "a potential customer
concerning the transaction of business.").  Evidence of actual confusion that is "isolated" or
"anecdotal" counsels against a finding of likelihood of confusion.  *Amicus Communs., L.P. v.
Hewlett-Packard Co.*, 1999 U.S. Dist. LEXIS 24031, at *70 (W.D. Tex. June 11, 1999) (collecting
cases).

At trial, Plaintiff's counsel was unable to identify a single instance where a prospective
customer of the Plaintiff was confused into doing business with Defendant.  T3 252:20-254:8.
That makes sense because the two companies are not in the same business.  Defendant does not and
could not provide the commercial and investment properties sought by Plaintiff's customers.  T2
228:3-16, 259:2-7, 264:11-21.  Rather, out of Plaintiff's approximately 2,500 customer contacts in
a year, it identified less than two dozen supposed instances of confusion.  Each was simply a wrong

number or misdirected email from a person *looking for a different "Rex" entity*.  P-68; P-80; P-181; P-182; P-183; P-184; P-69; P-73; P-35; D-209; P-66; P-67; P-60; T1 260:10-20; 261:5-262:12; T3 84:12-15.

Plaintiff introduced a handful of instances where someone assumed Plaintiff was Defendant, or someone associated with Plaintiff complained about Defendant's use of "Rex."  P-101; P-102; P-65.  Not one involved a person seeking to do business with Plaintiff.  *See Future Proof Brands, L.L.C. v. Molson Coors Bev. Co.*, 982 F.3d 280, 297 (5th Cir. 2020) (district court did not err in concluding that plaintiff had failed to show actual confusion where it "provide[d] no evidence that that confusion 'swayed customer purchases'"); *see also Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 582-83 (2nd Cir. 1991) ("Lang has not shown that these misdirected callers were prospective purchasers of Lang's products . . . there is no reason to believe that confusion represented by the phone calls could inflict commercial injury[.]"); *Duluth News-Tribune v. Mesabi Publ'g Co*., 84 F.3d 1093, 1098 (8th Cir. 1996) (misdirected calls and mail "show inattentiveness on the part of the caller or sender rather than actual confusion.").

Nor did Defendant uncover any evidence of customers who were looking for Plaintiff, but mistakenly did business with Defendant instead.  T3 11:19-12:10, 14:16-15:13.  At most, out of approximately seventeen million customer contacts, Defendant uncovered two chat messages potentially inquiring about Plaintiff.  P-78; P-95; T3 13:5-25.  In both instances, Defendant immediately responded that the chat sender had the wrong company.  These are not evidence of purchaser confusion and are *de minimis*.  *See Sun Banks,* 651 F.2d at 319.

### G.    Degree of Care Exercised By Potential Purchasers

The eighth digit looks to the degree of care exercised by potential purchasers.  The greater the care, "the less likely it is they will confuse a junior mark user's products or services with the senior mark user's products or services."  *Springboards*, 912 F.3d at 817.  Here, both customer bases are making substantial purchases that take time and attention to complete.  T3 14:23-15:13. Plaintiff's customers are highly sophisticated commercial buyers and institutional investors.  D-142

at 79; T1 254:24-253:1; T3 124:5-12.  This factor also favors Defendant.  *See Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 504 n.10 (5th Cir. 1979; *Oreck Corp. v. U.S. Floor Systems*, 803 F.2d 166, 173 (5th Cir. 1986) (people "buying for professional and institutional purposes at a cost in the thousands of dollars . . . are virtually certain to be informed, deliberative buyers.").

### H.    Plaintiff's Survey Evidence

Plaintiff's expert, Dr. Jeffery Stec, introduced evidence of a survey he conducted supposedly demonstrating a likelihood of confusion.  Dr. Stec's survey (a modified "Squirt" survey) showed survey respondents the parties' uses of their marks back-to-back.  T3 165:21-167:20.  He first showed the survey respondents – all of whom were residential customers (not commercial or investment customers) – the Plaintiff's website and instructed them to review it "as you would if you were considering these real estate services."[3]  *Id.*  He then showed them Defendant's website.  T3 165:19-167:3.

The Squirt format, which places the parties' marks in close proximity, is improper unless the marks are actually encountered by consumers in close proximity in the marketplace.  *See* 6 MCCARTHY § 32:174.50 (stating the Squirt type survey is inappropriate unless there are "a significant number of real world situations in which both marks are likely to be seen in the marketplace sequentially or side-by-side.").  But, as noted, the Parties market to different classes of consumers, in different markets, using different marketing channels.  *See supra* at 14.  Therefore, the Parties' marks are not seen in close proximity and would not be seen by consumers in the manner shown by the Stec survey.  Because Dr. Stec's survey did not approximate real world conditions, it was unreliable and therefore insufficient to support a reasonable jury verdict in

---

[3] This instruction alone was problematic since the survey respondents were all *residential* consumers and thus would have no reason to review Plaintiff's website in the real world "as if they were considering [the commercial and investment] real estate services" it describes.  *See Native Am. Arts, Inc. v. Bud K World Wide, Inc.*, 2012 U.S. Dist. LEXIS 69715, at *18 (M.D. Ga. May 18, 2012) (excluding survey "that does not adequately simulate how a consumer would encounter a trademark").

Plaintiff's favor.  *See Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, 2007 WL 2258688, at *7 (S.D.N.Y. Aug. 6, 2007) (excluding survey where "the back-to-back, or seriatim, display of the Cargo and Kargo marks did not approximate conditions that consumers would encounter in the marketplace"); *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1147-48 (10th Cir. 2013) (rejecting survey that showed "screenshots of search results from online shopping websites, where both SinuCleanse products and SinuSense products are featured" because there was no evidence that "SinuCleanse and SinuSense were sold side-by-side in stores").

* * *

In sum, no reasonable jury could find for Plaintiff on any of the eight digits in the confusion analysis.

## V.     Defendant Is Entitled To Judgment As A Matter Of Law On Plaintiff's Claim For Dilution

Count VII of Plaintiff's Complaint asserts a claim for trademark dilution.  Plaintiff did not submit a proposed jury charge or verdict form on this claim, and therefore waived it.  The claim also fails on the merits, which require a showing that Plaintiff's "Rex" marks are famous.  *See* 15 USC § 1125(c); Tex. Bus. & Com. Code § 16.103.  Here, where Plaintiff has adduced no evidence that consumers are even aware of its claimed marks and its own expert has admitted they are not well-recognized, no reasonable jury could find that they are famous.  *See Cathey Assocs., Inc. v. Beougher*, 95 F. Supp. 2d 643, 656 (N.D. Tex. 2000); *Springboards*, 912 F.3d at 818 (mark must be "widely recognized by the general consuming public of the United States").

## VI.    No Reasonable Jury Could Find That Plaintiff Has Suffered Harm From The Alleged Infringement Or That Defendant Has Been Unjustly Enriched

At trial, Plaintiff sought unjust enrichment and corrective advertising damages, a reasonable royalty and a nationwide injunction.  It also sought attorneys' fees for alleged willful infringement. *See* Counts V, VIII, and IX; Request for Relief.  Even if Plaintiff were able to demonstrate valid

trademarks and a likelihood of confusion, it would not be entitled to any of the remedies it requests.

### A.   Plaintiff Is Not Entitled to Damages

Plaintiff has the burden of proving with reasonable certainty that it suffered harm as a result of the alleged infringement.  *See McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 360-61 (9th Cir. 1996); *Nova Consulting Grp., Inc. v. Eng'g Consulting Servs., Ltd.*, 2005 U.S. Dist. LEXIS 46925, at *94 (W.D. Tex. June 3, 2005) (granting summary judgment on infringement claim where only evidence of damage was "conclusory and speculative").  Plaintiff did not bear this burden.  It was unable to identify a single instance of lost business to Defendant.  T2 53:3-11, 56:2-4; T3 216:4-19, 252:20-254:8.  Plaintiff has not altered its advertising in response to Defendant and has not spent a dollar on corrective advertising.  T2 56:5-8; T3 90:9-16.  Nor is it aware of any facts suggesting it has accepted a commission of less than six percent more frequently now than in the past.  T3 131:23-132:3.  Plaintiff's expert was unable to point to any damage it sustained by virtue of Defendant's operations.  T3 216:3-21.  The evidence instead demonstrated that the parties are not competitors; the claimed infringement has not caused actual confusion; and any confusion that could conceivably exist did not harm Plaintiff.

Even if Plaintiff had shown some cognizable harm, it must also demonstrate that the damages sought are "attributable to [Defendant's] unlawful use of its trademark."  *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 369, 372 (5th Cir. 2000); *see also Tex. Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.*, 951 F.2d 684, 696 (5th Cir. 1992) (no disgorgement where there was "no basis for inferring that any of the profits received . . . are attributable to infringement"); *Quick Techs., Inc. v. Sage Group Plc*, 313 F.3d 338, 350 (5th Cir. 2002); Restatement (Third) of Unfair Competition § 37, cmt. b.  With respect to disgorgement in particular, "[t]o show attribution, a plaintiff must present evidence that the defendant benefited from the alleged [violation].  Without such evidence, a Lanham Act plaintiff cannot recover a defendant's profits even if disgorgement would otherwise be equitable."  *Ill. Tool Works, Inc. v. Rust-Oleum Corp.*, 955 F.3d 512, 516 (5th

Cir. 2020) (internal quotation and citation omitted).

Plaintiff did not demonstrate attribution.  The evidence at trial was uncontroverted that customers are driven to Defendant by its value proposition–the opportunity to purchase a home without the high fees charged by traditional brokers.  T2 at 265:2-18, 266:4-267:1.  By contrast, there was no evidence at trial that Defendant benefited from an impression it was affiliated with Plaintiff.  Plaintiff's expert did not even consider whether Defendant would have generated the same revenue under a different name.  T3 at 217:4-16.  Instead, Plaintiff simply claimed entitlement to every penny of Defendant's revenues nationwide, on the theory there is a "presumption that every sale that was made was the result of the infringement."  *See* T3 251:2-252:5.  Plaintiff could not "produce evidence of one connected sale or revenue that's traceable to the infringement."  T3 252:9-19.  Nor could it identify "one instance where you have someone who has said that they would have otherwise done business with you in a deal of the type that you do but they didn't do it because of the infringement."  *Id.* 252:20-253:12.  There is no evidence Defendant made any sale from the alleged infringement.

Every remedy Plaintiff seeks is also improper for additional reasons.  Plaintiff has satisfied none of the six factors courts in this circuit employ to determine whether disgorgement is appropriate.  *See Seatrax*, 200 F.3d at 369; *see also Quick Techs*, 313 F.3d at 349.  In this case, disgorgement would afford Plaintiff an impermissible windfall given the absence of actual harm.  *See Seatrax*, 200 F.3d at 369; *Quick Techs.*, 313 F.3d at 350; *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869, 883 (5th Cir. 2019).  In addition, "a plaintiff who cannot demonstrate diversion [of sales] or palming off faces an uphill battle," *Retractable*, 919 F.3d at 882, and while willfulness may not be an absolute requirement, it is a heavy consideration.  *See Neutron Depot, L.L.C. v. Bankrate, Inc.*, 798 F. App'x 803, 807-08 (5th Cir. 2020) ("We regularly reverse juries' profit-disgorgement awards for lack of evidence of willfulness."); *see also Tex. Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.* 951 F.2d 684, 696 (5th Cir. 1992) (no disgorgement where no palming off or lost sales); *Seatrax*, 200 F.3d at 372 (no disgorgement where no "palming

off").  Plaintiff does not claim palming off, and it failed to establish willfulness at trial.  *See infra* pp. 23-24.  Finally, the evidence showed that Defendant has no profits to disgorge because Defendant incurred net losses over the specified period.  *See* T2 137:1-5, 156:5-7; *see Heartbrand Holdings, Inc. v. Whitmer*, 2021 U.S. Dist. LEXIS 92507, at *16 (W.D. Tex. May 14, 2021) (no disgorgement where net losses exceeded gross profits).

Corrective advertising damages are compensatory and should only be awarded to counteract the public confusion resulting from a defendant's trademark infringement.  *See Ill. Tool Works*, 955 F.3d at 516 (no damages where plaintiff "did not show a loss for which it needs compensation[.]").  Even in cases where a plaintiff has shown reputational injury, which Plaintiff has not shown here, damages are inappropriate where "there [is] no evidence that . . . injury had any effect on [plaintiff's] bottom line."  *Id.* at 516.  Offering only evidence of what a plaintiff "spent on its own advertising" without showing "what corrective advertising might entail or cost . . . [or] that it is even necessary" is insufficient.  *Id.*; *see also New Century Fin., Inc. v. New Century Fin. Corp.*, 2005 U.S. Dist. LEXIS 45960, at *11 (S.D. Tex. Nov. 29, 2005) (granting *Daubert* motion on corrective advertising damages where expert "did not know how much confusion existed in the marketplace"); *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, 2006 U.S. Dist. LEXIS 30219, *6 (S.D.N.Y. May 18, 2006) (corrective advertising damages inappropriate where plaintiff had "not lost profits, lost sales or suffered any damage to its reputation through [defendant's] marketing of [the infringing product]").

The evidence at trial shows no cognizable evidence of confusion (much less that Plaintiff suffered any resulting injury) or competent analysis of what corrective advertising might cost.  Plaintiff admitted that it spent no money on corrective advertising.  T3 90:9-16.  Plaintiff's expert merely adopted as his own opinion, without any verification or analysis, a representation from Mr. Glendenning that Plaintiff would need to spend a year's worth of advertising expenditures in the amount of $407,377.  T3 at 197:4-15, 221:19-225:20.  Indeed, Plaintiff's expert testified that the accuracy of Mr. Glendenning's figure was immaterial to his "analysis."  *Id.*  An expert, however,

must "do more than merely repeat a damages estimate provided by the party on whose behalf he is to testify, especially where he did not attempt to verify the information presented to him." *United States ex rel. Dekort v. Integrated Coast Guard Sys.*, 2010 U.S. Dist. LEXIS 144237, at *12 (N.D. Tex. Oct. 8, 2010).

A reasonable royalty rate must "be rationally related to the scope of the defendant's infringement." *Streamline Prod. Sys.* 851 F.3d at 461. Plaintiff's expert provided no rational basis for the six percent royalty it requested. He failed to account for the crowded field of other "Rex"s with whom Plaintiff is effectively "sharing" trademark rights (which drastically reduce or eliminate any licensing value), the absence of any evidence that Plaintiff's "Rex" marks have value, or his own admission that Plaintiff's marks are not recognizable. T3 160:5-161:5; 218:16-20. Plaintiff has never negotiated a license for its trademarks. T3 139:17-140:5. The record is devoid of evidence that anyone in a hypothetical negotiation would pay a cent to license the "Rex" name from Plaintiff nationwide. Where, as here, the evidence instead shows that "[defendant's] business came from customers . . . who were not customers of [plaintiff]," reasonable royalty damages cannot be awarded. *Streamline Prod. Sys.,* 851 F.3d at 461.

### B.    Plaintiff Is Not Entitled to a Nationwide Injunction

In Count VIII, Plaintiff also requested a nationwide injunction against Defendant and cancellation of Defendant's "Rex" trademark registrations and application before the PTO. No reasonable jury could find that Plaintiff is entitled to those remedies. Plaintiff has not established that its descriptive marks have attained secondary meaning at all, let alone nationwide. Nor has it demonstrated a likelihood of confusion.

### C.    Plaintiff Is Not Entitled to Attorneys' Fees Or A Finding of Willfulness

Reasonable attorneys' fees are available in the Court's discretion under the Lanham Act in "exceptional" cases. 15 U.S.C. § 1117(a). An "exceptional" case is one which "stands out from others with respect to the substantive strength of a party's litigating position," or where the unsuccessful party litigated the case in an "unreasonable" manner. *Id.* In Count IX, Plaintiff

contends this case is "exceptional" because "Defendant's actions have been willful and deliberate[.]"  Complaint at ¶ 32.  Infringement is "willful" where done "voluntarily and intentionally and with the specific intent to cause the likelihood of consumer confusion."  *Neutron*, 798 F. App'x at 807-08.  "[I]nten[t] to use the trademarked phrase" without "'specific intent to cause' confusion or to deceive" is not enough.  *Id.*; *Streamline*, 851 F.3d at 456; *see also Lindy Pen Co. v. Bic Pen Corp.*,, 982 F.2d 1400, 1405-06 (9th Cir. 1993).  The record is uncontroverted that Defendant chose the name "Rex" independently and had no intent to cause confusion with Plaintiff.  *Supra* at 15.  Plaintiff relied nearly exclusively on a November 2016 email where Defendant's co-founder Jack Ryan commented that "[t]his may be the one person who has had this name before us" (P-47), but Mr. Ryan explained that he came up with the name "Rex" years earlier in 2012 or 2013 without any knowledge of Plaintiff; Defendant believed in good faith it had the right to use "Rex" nationwide after acquiring trademark rights from Azavea; and that the email's reference to having "this name before us" was a reference to the URL.  T2 at 144:7-12, 232:4-21; 254:19-255:15.  Finally, Plaintiff pointed to the fact that Defendant was required to register with the Texas Secretary of State under an assumed name, but provided no evidence why that was required.  T2 167:17-168:12.  Plaintiff's suggestion that it was due to use of the name "Rex" was undermined by its own admission that scores of other Rexes are registered to do business in Texas. P-270.  Moreover, the rules governing Defendant's technical licensure to transact business in Texas are by their own terms not relevant to the determination of trademark rights.  *See* TEX. BUS. ORG. CODE §  9.001; 1 TEX. ADMIN. CODE §§  79.30 *et seq.*; TEX. BUS. & COM. CODE §§ 71.003, 71.157.

## **CONCLUSION**

For the foregoing reasons, the Court grants Defendant's motion for judgment as a matter of law.  The Court will issue a separate judgment.

**IT IS SO ORDERED**.

**SIGNED** on _____, 2022.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE