IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| REX REAL ESTATE I, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:19-cv-00696-RP-DH |
| | § | |
| REX REAL ESTATE EXCHANGE INC., | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO THE COURT'S ORDER GRANTING
DEFENDANT'S RULE 50(A) MOTION AND DEFENDANT'S SUBSEQUENT BRIEF**

## TABLE OF CONTENTS

I.    INTRODUCTION..................................................................................................1

II.   THE EVIDENCE SUPPORTS A REASONABLE JURY FINDING THE
      FOLLOWING FACTS ........................................................................................3

III.  LEGAL STANDARD ..........................................................................................4

IV.   PLAINTIFF PRESENTED SUFFICIENT EVIDENCE AS A MATTER OF LAW
      ON ITS CLAIM FOR TRADEMARK INFRINGEMENT ...............................4

      A.    Plaintiff Owns Protectable Rights in the Trademarks .......................5

            1.    Plaintiff's REX REAL ESTATE (crown logo) Mark is Incontestable..5

            2.    Plaintiff's Trademarks are Inherently Distinctive...............................7

                  a.    The Lanham Act Does Not Require First Names To Have
                        Secondary Meaning Before They Can be Protected as a
                        Trademark ...........................................................................8

            3.    Plaintiff's Trademarks Acquired Distinctiveness Through Secondary
                  Meaning ...............................................................................................11

      B.    There is a Likelihood of Confusion Between Plaintiff and Defendant............13

            1.    Plaintiff Has a Strong Mark.................................................................13

            2.    Plaintiff's and Defendant's Trademarks are Identical.........................14

            3.    Plaintiff and Defendant Are Offering Real Estate Brokerage
                  Services.................................................................................................14

            4.    Plaintiff and Defendant Offer Real Estate Services to the Same
                  Potential Consumers .............................................................................15

            5.    Plaintiff and Defendant Advertise Using the Same Media .................16

            6.    Defendant Knew Plaintiff Was Using the Trademarks for Providing
                  Real Estate Services .............................................................................16

            7.    Plaintiff Provided Substantial Evidence of Actual Confusion............18

            8.    Potential Purchasers of Real Estate Are Not Sophisticated With
                  Regards to Real Estate Services............................................................20

V.    A REASONABLE JURY COULD HAVE FOUND THAT PLAINTIFF IS
      ENTITLED TO AN AWARD OF DAMAGES...............................................20

**A.** **Plaintiff is Entitled to an Award of Damages because of Defendant's Infringement of Plaintiff's Trademarks** ............................................20

1.   **A Reasonable Jury Could Award Plaintiff Damages for Corrective Advertising**....................................................................21

2.   **A Reasonable Jury Could Award Plaintiff a Reasonable Royalty Fee**..................................................................................23

3.   **A Reasonable Jury Could Award Plaintiff the Profits of Defendant**..24

**B.** **Plaintiff is Entitled to a Finding of Willfulness and Attorneys' Fees**............25

**VI.   DEFENDANT'S OTHER ARGUMENTS LACK MERIT** .........................................27

**A.** **Defendant Did Not Obtain Trademark Rights From Third Party Azavea** ....27

**VIII.   CONCLUSION** .........................................................................29

# TABLE OF AUTHORITIES

**CASES:**

*815 Tonawanda St. Corp. v. Fay's Drug Co.*, 842 F.2d 643 (2nd Cir. 1988) ..............................10

*A Touch of Class Jewelry Co. v. J.C. Penney Co.*,
No. 98-2949, 2000 U.S. Dist. LEXIS 12898 (E.D. La. Aug. 28, 2000) ......................................26

*Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225 (5th Cir. 2010).................5, 7, 11, 12

*Am. Century Proprietary Holdings, Inc. v. Am. Century Cas. Co.*,
 295 F. App'x 630 (5th Cir. 2008). ..............................................................................................13

*Amy's Ice Cream Inc. v. Amy's Kitchen, Inc.*, 60 F. Supp.3d 738, (W.D. Tex. 2014) ................10

*Anthony v. Chevron USA, Inc.*, 284 F.3d 578 (5th Cir. 2002) ........................................................1

*Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155 (5th Cir. 1982) ...................13, 18

*Berg v. Symons*, 393 F. Supp. 2d 525 (S.D. Tex. Sept. 30, 2005) .................................................25

*Brennan's Inc. v. Dickie Brennan & Co. Inc.*, 376 F.3d 356 (5th Cir. 2004);..............................23

*Broad. Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233 (5th Cir. 1988); ..............................................25

*Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695 (5th Cir. 1981) ............9

*Choice Hotels, Int'l. Inc. v. Patel*, 940 F. Supp. 2d 532 (S.D. Tex. 2013)....................................24

*Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047 (6th Cir. 1999) ...................................10

*Elvis Presley Enter. Inc. v. Capece*, 141 F.3d 188 (5th Cir. 1998)...............................................18

*Epic Tech, LLC v. Lara*,
No. 4:15-CV-01220, 2017 U.S. Dist. LEXIS 196705 (S.D. Tex. Nov. 30, 2017) .......................25

*Exxon Corp. v. Humble Exploration Co., Inc.*, 695 F.2d 96 (5th Cir. 1983)................................29

*Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466 (3d Cir. 1994);..............................13

*Ford v. Cimarron Ins. Co.*, 230 F.3d 828 (5th Cir. 2000) ...............................................................4

*Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800 (5th Cir. 1997) .................................................4

*GMA Accessories, Inc. v. Croscill, Inc.*,
No. 06-cv-6236, 2008 WL 591803 (S.D. N.Y. 2008) ..................................................................10

*Gorgeous Gals LLC V. Hey Gorgeous! Spa & Wellness, LLC*,
No. 1:16-CV-903-RP, 2017 WL 5016036 (W.D. Tex. Nov. 2, 2017) .........................................16

*Haas Outdoors, Inc. v. Dryshot Intern., LLC*,
No. 1:18-cv-596-RP, 2020 WL 5366292 (W.D. Tex. Sept. 8, 2020);...........................................23

*Hard Rock Café Licensing Corp. v. Concession Servs.*, 955 F.2d 1143 (7th Cir. 1992)..............26

*Heartbrand Holdings, Inc. v. Whitmer*,
No. SA-19-CV-358-HJB, 2021 WL 1947875 (W.D. Tex. May 14, 2021) ..................................24

*Illinois Tool Works, Inc. v. Rust-Oleum Corp.*, 955 F.3d 512 (5th Cir. 2020) .............................22

*In Skippy, Inc. v. CPC Intern., Inc.*, 674 F.2d 209 (4th Cir. 1982)................................................6

*Jones v. Am. Council on Exercise*, 245 F. Supp. 3d 853 (S.D. Tex. 2017) ..................................16

*Lane Capital Management, Inc. v. Lane Capital Mgmt. Inc.*,
192 F.3d 337 (2d Cir. 1999)..........................................................................................10, 11

*Lowe v. Eltan, B.V.*, 2018 WL 7822940 (E.D. Tex. 2018) ...........................................................24

*Microsoft Corp. v. Software Wholesale Club, Inc.*,
129 F. Supp. 2d 995 (S.D. Tex. Dec. 15, 2000)...............................................................25

*Nolen v. Lufkin Indus, Inc.*, 2011 WL 10581991 (W.D. Tex. 2011) .............................................10

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189 (1985) .........................................5, 6

*Peaceable Planet, Inc. v. Ty Inc.*, 362 F.3d 986 (7th Cir. 2004) ...........................................8, 9, 10

*Philip Morris USA Inc. v. Lee*, 549 F. Supp. 2d 839 (W.D. Tex. Apr. 8, 2008). ...................25, 26

*ProTradeNet, LLC v. Predictive Profiles, Inc.*,
No. 6:18-CV-38-ADA, 2020 WL 5510732 (W.D. Tex. Mar. 10, 2020).........................21, 22, 23

*Real Estate One, Inc. v. Real Estate 100 Enter. Corp.*, 212 USPQ 957 (TTAB 1981). ...............20

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)...............................................1, 4

*Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492 (2020). ....................................................24

*SecuraComm Consulting Inc. v. Securacom Inc.*, 166 F.3d 182 (3rd Cir. 1999) .........................26

*Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*,
851 F.3d 440 (5th Cir. 2017). ....................................7, 8, 11, 13, 14, 15, 16, 18, 20, 23

*Sunenblick v. Harrell*, 895 F.Supp. 616 (S.D.N.Y. 1995) ...............................................13

*Sunrise Jewelry Mfg. Corp. v. Fred S.A.*, 175 F.3d 1322 (Fed. Cir. 1999) ...................................6

*Tana v. Dantana's*, 611 F.3d 767 (11th Cir. 2010)..........................................................10

*Taylor-Travis v. Jackson State Univ.*, 984 F.3d 1107 (5th Cir. 2021)......................................4, 6

*Two Pesos Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992) ...............................................9

*United States v. Scott*, 159 F.3d 916 (5th Cir. 1998) ...................................................26

*Wallace Intern. Silversmiths Inc. v. Wallace Co. Inc.*,
1988 WL 268169 (N.D. Ala. 1988) ........................................................................5

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205 (2000)........................................7, 8

*Waterloo Sparkling Water Corp. v. Treaty Oak Brewing and Distilling Co., LLC*,
No. 1:21-CV-161-RP, 2021 WL 5568159 (W.D. Tex., Nov. 24, 2021). .......................................18

*Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658 (5th Cir. 2000)................................13

*Westfall v. Luna*, 2022 WL 797410 (5th Cir. 2022). .......................................................1

## STATUTES:

15 U.S.C. § 1115(b) .....................................................................................5

15 U.S.C. § 1117(a) ....................................................................................24

15 U.S.C. §1052(e)(4) ...................................................................................8

15 U.S.C. § 1065 ........................................................................................6

## RULES:

Fed. R. Civ. P. 50(a)(1). ...............................................................................4

Fed. R. Evid. 301 ......................................................................................12

## OTHER SOURCES:

Trademark Manual of Examining Procedure Section 1605.04....................................................7

3A Fed. Jury Prac. & Instr. §159:91 (6th ed.)...........................................................21

## I.     INTRODUCTION

Plaintiff files this brief in opposition to the Court's April 13, 2022 Order granting Defendant's Rule 50(a) motion and the subsequent brief filed May 5, 2022 by Defendant (Doc. 228).   Though this Court invited written briefing, the Court has already granted Defendant's motion and Plaintiff's right to a jury trial has already been taken away.   Procedurally, Defendant's brief is more properly characterized as "proposed findings of fact and conclusions of law to support the Court's Order granting a Rule 50(a) motion"— as if the case was tried to the bench and without a jury.   But there was a jury.   Defendant's motion was granted at the close of Plaintiff's case and before Defendant put on its case.   The jury was dismissed without rendering a verdict.

Tellingly, Defendant's brief omits the appropriate legal standard applicable to orders granting a Rule 50(a) motion.   The Fifth Circuit applies the *de novo* standard when reviewing an order granting a Rule 50(a).   *Anthony v. Chevron USA, Inc.*, 284 F.3d 578, 583 (5th Cir. 2002). The standard for granting a judgment as a matter of law motion was set forth by the Supreme Court in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000).   The Supreme Court described the standard this way:

> It therefore follows that, in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record.
>
> In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."
>
> *Id*. (cleaned up); *Westfall v. Luna*, 2022 WL 797410 (5th Cir. 2022).

In an attempt to provide suggested findings of fact and conclusions of law to support the Court's improper grant of a Rule 50(a) motion, Defendant's brief not only ignores the proper legal standard and fails to construe the evidence in favor of Plaintiff, but it mischaracterizes the evidence of record that could have supported a jury verdict in favor of Plaintiff from a reasonable jury. Defendant's brief does not cite a single decision from the Fifth Circuit condoning a grant of a 50(a) motion in a trademark case.  Defendant also failed to introduce any testimony from a disinterested witness; instead, Defendant rested its case without presenting any evidence or testimony in rebuttal to Plaintiff's case-in-chief.  The Court gave the Defendant the opportunity to present a rebuttal case, but Defendant declined to do so, thus waiving the opportunity.

Applying the proper legal standard, this brief outlines what a reasonable jury could have found from the evidence to support a verdict in favor of Plaintiff.  On May 11, 2022, the Court provided its proposed jury instructions and jury verdict form.  Exhibit A.  The verdict form included only six simple questions that the jury could have reasonably resolved in Plaintiff's favor. The jury form is reproduced as Exhibit B in a form annotated with the evidence introduced at trial that supports a verdict in favor of Plaintiff.

The evidence at trial, viewed in the light most favorable to Plaintiff could have supported the following findings from a reasonable jury: Plaintiff owned the asserted federal trademark registrations for REX, REX REAL ESTATE and REX REAL ESTATE with CROWN LOGO ("Trademarks") which all describe the services covered by the registrations as including "real estate brokerage" services ("Services"); Plaintiff had priority of use of the Trademarks as compared to Defendant; Plaintiff had the exclusive right to use the Trademarks for the Services; Plaintiff's Trademarks were strong marks; Defendant's use of the Trademarks REX and REX REAL ESTATE to provide the same Services was likely to cause confusion and infringed;

Defendant willfully infringed; Plaintiff is entitled to actual damages, including a reasonable royalty and corrective advertising; Defendant was unjustly enriched by its willful infringement and Plaintiff was entitled to the remedy of disgorgement.

## II.    THE EVIDENCE SUPPORTS A REASONABLE JURY FINDING THE FOLLOWING FACTS

Plaintiff is a well-renowned, full service real estate brokerage firm serving commercial and residential clients.[1]  Plaintiff has used the Trademarks since at least 1987, to provide the Services throughout the State of Texas to consumers throughout the United States.  The founders used the Trademarks in connection with the Services as part of their business which was incorporated in 1991, the company was then made part of a limited partnership in 2000.  As Plaintiff's corporate representative testified at trial, the founders expressly contributed the Trademarks and goodwill of the business to the company, which then became part of the limited partnership.[2]  Plaintiff has received state and federal trademark registrations for the Trademarks in connection with the Services.  Plaintiff has spent millions of dollars advertising and promoting its Trademarks and Services, receiving extensive, unsolicited news coverage over the past 25 years.

Defendant was founded in 2014.  Before it even started doing business in 2015, Defendant became aware of Plaintiff and Plaintiff's Trademarks through a trademark search, acknowledging Plaintiff was "the one person who has had this name before [Defendant]."[3]  Yet, Defendant proceeded to willfully use identical trademarks for identical services as Plaintiff, unjustly enriching Defendant by taking advantage of Plaintiff's goodwill in the Trademarks.

In 2018, Defendant moved into the Texas market and began advertising in the state. Although Defendant told the State of Texas it would only operate using the name "Rexchange,"

---

[1] R. Glendenning Tr. 120:14, Apr. 12, 2022; Stec Tr. 160:13-161:1, Apr. 12, 2022.
[2] R. Glendenning Tr. 107:8-17, Apr. 12, 2022.
[3] PTX No. 47-49, Domain Emails [DEF004300-03]; Ryan Tr. 144:24-145:20, Apr. 11, 2020.

Defendant instead began advertising its Services using Plaintiff's Trademarks. It even switched its domain name from www.rexchange.com to its current website www.rexhomes.com since Plaintiff already had the domain name www.rexrealestate.com.[4] Within months Plaintiff started receiving calls from consumers who were confused and believed Plaintiff was the source of Defendant's various advertisements for Services.[5]

Defendant's willful infringement has caused, and continues to cause, actual confusion; thus diminishing the value of Plaintiff's Trademarks and unjustly enriching Defendant.

## III.    LEGAL STANDARD

Judgment as a matter of law is only proper if "there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." *Ford v. Cimarron Ins. Co.*, 230 F.3d 828, 830 (5th Cir. 2000) (quoting *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 804 (5th Cir. 1997)); FED. R. CIV. P. 50(a)(1). On a motion for judgment as a matter of law, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves*, 530 U.S. at 149; *Taylor-Travis v. Jackson State Univ.,* 984 F.3d 1107, 1112 (5th Cir. 2021). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id*. Likewise, "[t]he court must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.*

## IV.    PLAINTIFF PRESENTED SUFFICIENT EVIDENCE AS A MATTER OF LAW ON ITS CLAIM FOR TRADEMARK INFRINGEMENT

Plaintiff presented sufficient evidence at trial to establish the elements for a trademark infringement claim: (1) Plaintiff owns protectable trademarks and (2) there is a likelihood of

---

[4] Ryan Tr. 232:22-234:2, Apr. 11, 2022.
[5] PTX No. 68, 80, and 181-184, Call sheets.

confusion as to the source, affiliation or sponsorship of Defendant's services.   *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235 (5th Cir. 2010).

A.     **Plaintiff Owns Protectable Rights in the Trademarks**

1.     **Plaintiff's REX REAL ESTATE (crown logo) Mark is Incontestable**

Plaintiff satisfies the first element because its REX REAL ESTATE (crown logo) registration is incontestable.  Plaintiff has used the mark for more than five consecutive years from the registration's issuance date,[6] with Plaintiff having filed a Combined Declaration of Use and Incontestability under Sections 8 & 15 with the United States Patent and Trademark Office ("PTO") on January 14, 2020 concerning such registration.[7]  Plaintiff's declaration was accepted by the PTO on March 10, 2020, making Plaintiff's federal trademark registration for REX REAL ESTATE (crown logo) incontestable pursuant to 15 U.S.C. §§ 1065 and 1115(b).

An incontestable registration is *conclusive evidence* of the validity of the registered mark and its registration, of the registrant's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce, subject to certain limited defenses and exceptions.  15 U.S.C. § 1115(b).  Incontestable status "cut[s] off two of the most important challenges to the status of an incontestable mark:  (i) that the mark is not inherently distinctive; and (ii) that the mark is inferior in priority to the challenger's previously used mark."  *Wallace Intern. Silversmiths Inc. v. Wallace Co. Inc.*, 1988 WL 268169, at *2 (N.D. Ala. 1988) (citing *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189 (1985)).  The available challenges against an incontestable registration are accordingly limited and enumerated in the statute.  *Id*.  Defendant presented no evidence in support of these limited available challenges to rebut Plaintiff's incontestability status

---

[6] Sherese Glendenning Tr. 57:25-58:5, 61:14-62:4, Apr. 8, 2022; Rex Glendenning Tr. 101:20-102:8, Apr. 12, 2022.
[7] Sherese Glendenning Tr. 147:22-149:1, Apr. 8, 2022; DTX No. 292, U.S. Reg. No. 4,670,686 Status and Trademark Documents.

in the REX REAL ESTATE (crown logo) mark.  Regardless, even if it had, the Court must disregard such evidence in considering a Rule 50(a) motion.  *Taylor-Travis*, 984 F.3d at 1112 ("court must disregard all evidence favorable to the moving party that the jury is not required to believe.").  Nor can Defendant legally defeat a claim of infringement of an incontestable mark on the grounds that the mark is merely descriptive or otherwise not inherently distinctive, which is what Defendant is attempting to do.  *Park 'N Fly, Inc.*, 469 U.S. at 199.

Defendant argues that the registration has not achieved incontestability because of this proceeding and that this proceeding falls within an exception to 15 U.S.C. § 1065.  Doc. 228, p. 9. That exception, however, applies only to a proceeding pending in a court that involves "the right of the owner to use such registered mark in commerce for the goods or services."  In this case, Defendant did not contest Plaintiff's right to use the registered mark in commerce for its services. The one case cited by Defendant is inapposite.  *In Skippy, Inc. v. CPC Intern., Inc.*, 674 F.2d 209, 216 (4th Cir. 1982), the Court found that there had been a prior decision adverse to the trademark owner's right to register the mark and that therefore the affidavit was false. In this case, however, the issue of Plaintiff's right to register the mark is not at issue and there has been no prior adverse ruling as to that issue.  Thus, the exception is not applicable and Plaintiff's Asserted Trademark is incontestable.

In *Sunrise Jewelry Mfg. Corp. v. Fred S.A.*, 175 F.3d 1322 (Fed. Cir. 1999), the Federal Circuit held that a registrant does not engage in fraud in connection with a declaration of incontestability when there is no counterclaim in the pending infringement action challenging the validity of the registration at the time of the declaration.  *Id*. at 1327 (holding that the allegations of fraud were legally insufficient).  In this case, there is no counterclaim by Defendant challenging the validity of Plaintiff's registration.  Thus, the PTO found no basis to preclude Plaintiff from

filing the affidavit of incontestability; nor was there a basis for the PTO to preclude its acknowledgement of the affidavit. As set forth in the Trademark Manual of Examining Procedure Section 1605.04, "[t]he USPTO does not consider a proceeding involving the mark in which the owner is the plaintiff, where there is no counterclaim involving the owner's rights in the mark, to be a 'proceeding involving these rights' that would preclude the filing or acknowledgment of a §15 affidavit or declaration." As such, Plaintiff's filing of a Combined Declaration of Use and Incontestability under Sections 8 & 15 with the PTO on January 14, 2020 for its U.S. Registration No. 4,670,686 for REX REAL ESTATE (crown logo) was entirely proper, including as officially acknowledged by the PTO on March 10, 2020.

With this incontestable registration alone, a reasonable jury could have rendered a verdict in favor of Plaintiff; but Plaintiff has four other registrations.

## 2.    Plaintiff's Trademarks are Inherently Distinctive

To the extent that Defendant raised a challenge at trial to the validity of Plaintiff's other four registrations, Plaintiff demonstrated that those marks were protectable and distinctive. *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.,* 851 F.3d 440, 451 (5th Cir. 2017). "To be legally protectable, a mark must be 'distinctive' in one of two ways: (1) inherent distinctiveness or (2) acquired distinctiveness through secondary meaning." *Id.* The mark is "inherently distinctive if its intrinsic nature serves to identify a particular source" and develops secondary meaning "when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Amazing Spaces,* 608 F.3d at 235*, quoting, Wal-Mart Stores, Inc. v. Samara Bros., Inc*. 529 U.S. 205, 210-11 (2000). Trademarks can be considered (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. *Id*. at 240. The

latter three categories are deemed inherently distinctive. *Id*. A mark is descriptive if it identifies a characteristic or quality of a recited good or service. *Id*. at 242.

While either inherent or acquired distinctiveness is sufficient to provide Plaintiff protectable rights in the Trademarks, evidence at trial established Plaintiff's Trademarks have both.

The PTO's registration of a mark  without the PTO requiring proof of secondary meaning creates the presumption that the mark is more than merely descriptive and, thus, that the mark is inherently distinctive. *Streamline,* 851 F.3d at 451 ("Registration of a mark with the PTO is 'prima facie evidence that the mark[ ] [is] inherently distinctive.'").

It is not disputed that Plaintiff registered its REX and REX REAL ESTATE marks with the PTO and State of Texas ("Plaintiff's Registrations")[8] all without Plaintiff being required to show secondary meaning.[9]  Therefore, the Trademarks are inherently distinctive. *Streamline*, 851 F.3d at 451.

> **a.  The Lanham Act Does Not Require First Names to Have Secondary Meaning Before They Can be Protected as a Trademark**

In its opening statement and throughout the trial, Defendant's counsel repeatedly misstated that "[p]ersonal name trademarks are not valid unless the owner achieves secondary meaning."[10] In fact, the Lanham Act is silent with respect to first and middle names, only requiring secondary meaning for registration, and thus protection, of names that are "*primarily merely a surname*." 15 U.S.C. §1052(e)(4) (emphasis added); *Peaceable Planet, Inc. v. Ty Inc*., 362 F.3d 986, 990 (7th

---

[8] PTX No. 1-5, U.S. Reg. No. 5,670,275 for REX, U.S. Reg. No. 5,684,581 for REX REAL ESTATE, U.S. Reg. No. 4,670,686 for REX REAL ESTATE (and design), TX Reg. No. 803,055,583 for REX, TX Reg. No. 803,055,593 for REX REAL ESTATE.
[9] *Id*.
[10] Def. Opening Slide No. 4; April 8, 2022 Tr. 6:14-8:8; 113:12-24; 122:13-15; 234:14-17; 241:18-22.

Cir. 2004) ("personal-name 'rule,' it is worth noting, is a common law rather than statutory doctrine"). The plain language of the statute does not require *first names* to have secondary meaning before they can be protected as a trademark. *Cf. Two Pesos Inc. v. Taco Cabana, Inc.* 505 U.S. 763, 774 (1992) (finding no basis to require secondary meaning for distinctive trade dress when it is not required for other distinctive marks).

The Fifth Circuit has never held—as Defendant alleges—that first names "are not valid" trademarks unless they achieve secondary meaning. *Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 702 (5th Cir. 1981) (only identifying family surnames, descriptive terms and geographic place names as requiring secondary meaning); *Two Pesos*, 505 U.S. at 773 (approving the *Chevron* analysis in finding trade dress can be inherently distinctive without secondary meaning). A showing of secondary meaning is required of a plaintiff in limited instances to allow a potential defendant to otherwise use his or her first name in an enterprise without committing infringement. When the plaintiff is using a first name in a business and the defendant is not, the rationale for the "personal-name rule" does not exist and secondary meaning is not required. The rationale for such a required showing is limited and focused on allowing a potential defendant to use his or her own first name. *Peaceable Planet,* 362 F.3d at 989-990. Where a first name does not trigger any of the reasons for the "personal name rule," the Seventh Circuit held there was no need to require secondary meaning to achieve trademark status. *Id*. ("Treating the personal-name rule as a prohibition against ever using a personal name as a trademark (in the absence of secondary meaning) would lead to absurd results, which is a good reason for hesitating to press a rule to its logical limit, its semantic outer bounds.").

The caselaw Defendant relies on is inapposite and only requires proof of secondary meaning for a first name used by a plaintiff when the defendant was not using an individual's given

first name in its own mark.  *Cf., Amy's Ice Cream Inc. v. Amy's Kitchen, Inc*., 60 F. Supp.3d 738, (W.D. Tex. 2014) (finding a question of fact precluding summary judgment for the name AMY where Amy was the name of the founder of defendant); *815 Tonawanda St. Corp. v. Fay's Drug Co.*, 842 F.2d 643, (2nd Cir. 1988) (requiring secondary meaning for the "commonly used woman's name" FAY); *Nolen v. Lufkin Indus, Inc.*, 2011 WL 10581991 at *1 (W.D. Tex. 2011) (holding that a plaintiff who never used his first name as a trademark did not have rights in SAM as a mark); *Tana v. Dantana's*, 611 F.3d 767, 774 (11th Cir. 2010) (involving a surname and there was no dispute the mark was protectable).

Here, Defendant acknowledges it is not using the REX mark because someone with Defendant has the first name Rex.[11]  Thus, the rationale applied by court holdings requiring secondary meaning in connection with the use of a personal first name by a plaintiff when the defendant is using its own personal first name are inapplicable to this case.  *Peaceable Planet,* 362 F.3d at 990.

Plaintiff presented evidence for the jury to conclude that the public does not perceive the mark to be a personal name, and thus Plaintiff has no burden to prove secondary meaning.  *Circuit City Stores, Inc. v. CarMax, Inc*., 165 F.3d 1047, 1054 (6th Cir. 1999) (while CARMAX mark was purportedly a combination of the first names Carson and Max, the public would not perceive it to be a combination of personal names when used as a mark to sell used cars); *Lane Capital Management, Inc. v. Lane Capital Mgmt. Inc.*, 192 F.3d 337, 347-48 (2d Cir. 1999) (mark LANE CAPITAL MANAGEMENT is not a personal name mark requiring secondary meaning because "lane" also has a nonsurname meaning, even though "Lane" was the nickname and middle name of the father of the founder of plaintiff and the middle name of the son of the founder); *GMA*

---

[11] Ryan Tr. 137:25-138:3; 230:17-231:24.

*Accessories, Inc. v. Croscill, Inc.,* No. 06-cv-6236, 2008 WL 591803, at *4 (S.D. N.Y. 2008) (CHARLOTTE as used on women's clothing accessories would not convey the impression that a woman of that name was associated with the company).

In this case, Rex is not a surname of anyone associated with Plaintiff. The word itself has an established meaning in Latin beyond being a first name; it means "king," as Plaintiff's principals testified at their depositions.[12] This established non-name meaning is one of the reasons Plaintiff selected the name Rex for his real estate company.[13] Defendant conceded that Plaintiff was using the term Rex according to the translation of Rex in Latin as "king."[14] For this additional reason, the Trademarks are protectable without a showing of secondary meaning. *Cf. Lane Capital Management,* 192 F.3d at 345 (using King as an example of a name that is not primarily merely a surname since it has an established meaning).

### 3.   Plaintiff's Trademarks Acquired Distinctiveness Through Secondary Meaning

Because the Trademarks are inherently distinctive, they are legally protectable. In addition, Plaintiff owns a protectable interest in the Trademarks for the separate and independent reason that the Trademarks have acquired distinctiveness through secondary meaning. *Streamline Prod. Sys., Inc.,* 851 F.3d at 451. At a minimum, a jury could reasonably find that Plaintiff's Trademarks have secondary meaning with respect to commercial real estate brokerage services.

A mark is distinctive if it acquires secondary meaning. *Amazing Spaces*, 608 F.3d at 237. Plaintiff's federal trademark registrations with the PTO constitute prima facie evidence of the validity of the Trademarks and a presumption that Plaintiff's registrations have a secondary meaning. *Id.* In addition to Plaintiff's federal trademark registration with the PTO—which alone

---

[12] Sherese Glendenning Tr. 132:19-25; Rex Glendenning Tr. 116:14-21.
[13] *Id.*
[14] PDX 84 at p. 11; Ryan Tr. 200:20-202:14.

is sufficient to show Plaintiff's registrations have a secondary meaning—Plaintiff presented additional evidence to prove secondary meaning.

Plaintiff has operated under the name Rex Real Estate for almost 35 years.[15]  Plaintiff has spent millions of dollars over the past ten years in connection with advertising and promoting its Trademarks.[16]  Over 100 consumer testimonials support a finding of secondary meaning, stating they recognize the Trademarks and identify them with Plaintiff and its high-quality and well-respected real estate services.[17]  The jury heard about these testimonials and was presented with a list of affiants.[18]  The Defendant did not move the court, nor did the court, instruct the jury to disregard that evidence.  Defendant's use of the Trademarks led to actual confusion.

Defendant had the burden to produce evidence to rebut the presumption that Plaintiff's Trademarks have a secondary meaning.  FED. R. EVID. 301 ("in a civil case [  ] the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption."); *Amazing Spaces*, 608 F.3d at 237 ("This presumption of validity may be rebutted by establishing the mark is not inherently distinctive.").

Defendant failed to meet its burden to rebut the presumption.  Defendant merely pointed to other companies using a version of a mark including the three letters REX for unrelated services in different markets.[19]  Plaintiff was able to dissect those collections of alleged third party uses and show that there were no active real estate brokers using the trademark REX to provide the Services other than the Plaintiff and the Defendant.  Regardless, Defendant's submission on this matter is irrelevant to a determination of whether Plaintiff's Trademarks have obtained secondary meaning.

---

[15] Sherese Glendenning Tr. 57:25-58:5, 61:14-62:4, Apr. 8, 2022; Rex Glendenning Tr. 101:20-102:8, Apr. 12, 2022.
[16] Sherese Glendenning Tr. 157:5-10, Apr. 8, 2022; PTX No. 116.
[17] PTX No. 171, Plaintiff List of Testimonial Declarations.
[18] *Id*.
[19] Ryan Tr. 237:3-11, Apr. 11, 2022.

*Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 479 (3d Cir. 1994); *Sunenblick v. Harrell*, 895 F.Supp. 616, 627 (S.D.N.Y. 1995).

**B.**     **There is a Likelihood of Confusion Between Plaintiff and Defendant**

Defendant completely ignores the existence of Plaintiff's expert witness Dr. Jeff Stec and his trial testimony that the Defendant's actions were likely to cause confusion.  But the Court is required to adopt those opinions because a reasonable jury could have done so.  In determining whether a likelihood of confusion exists, courts consider (1) the type of mark; (2) the similarity between the marks; (3) the similarity between the products or services; (4) the identity of the retail outlets and purchasers; (5) the identity of the advertising media used; (6) the defendant's intent; (7) any evidence of actual confusion; and (8) the degree of care exercised by potential purchasers. *Streamline,* 851 F.3d at 453.  A finding of a likelihood of confusion does not require a positive finding on a majority of these factors.  *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 664 (5th Cir. 2000).  Even when there is no evidence supporting several of the factors, a finding of likelihood of confusion may still exist where there is evidence of actual confusion. *Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1160 (5th Cir. 1982) (the court found actual confusion based on employee testimony that plaintiff received phone calls from people trying to reach defendant).  If the analysis is closely balanced, the likelihood of confusion analysis should be resolved in favor of the senior user (*i.e.* Plaintiff). *Am. Century Proprietary Holdings, Inc. v. Am. Century Cas. Co.*, 295 F. App'x 630, 637 (5th Cir. 2008).

**1.**     **Plaintiff Has a Strong Mark**

The type of mark refers to the strength of the mark along the generic to arbitrary continuum. *Streamline,* 851 F.3d at 453.  The more distinctive the mark, the more likely consumers would be confused by competing uses of the mark.  *Id*.  Additionally, "the fact that opposer's federally registered trademark has achieved incontestable status means that it is conclusively considered to

be valid, but it does not dictate that the mark is 'strong.'" *Safer, Inc. v. OMS Invs., Inc.*, 94 USPQ2d 1031, 1036 (TTAB 2010).

Here, Plaintiff presented evidence at trial that REX is a strong mark in connection with real estate.[20] *Defendant admitted that REX is a strong mark.*[21] Defendant's CEO, Jack Ryan, testified "the term Rex is a strong mark for use in real estate."[22] No third party—other than Defendant— uses the Trademarks in connection with real estate services.[23] Defendant did not present any contrary evidence at trial. Therefore, a reasonable jury could have found that this factor favors a finding of likelihood of confusion.

### 2. Plaintiff's and Defendant's Trademarks are Identical

Assessing the similarity of the marks "requires consideration of the mark's appearance, sound and meaning." *Streamline,* 851 F.3d at 453. Even if two marks are distinguishable, the question is whether they are similar enough that a reasonable person could believe they have the same origin or association. *Id.* Here, Defendant is using marks *identical* to Plaintiff's Trademarks.[24] Defendant did not—and could not—dispute they are using an identical mark as Plaintiff's Trademarks. Therefore, a reasonable jury could have found that this factor favors a finding of likelihood of confusion in favor of Plaintiff.

### 3. Plaintiff and Defendant Are Offering Real Estate Brokerage Services

"The greater the similarity between the products and services, the greater the likelihood of confusion." *Streamline,* 851 F.3d at 454. Here both companies are using the Trademarks to

---

[20] Ryan Tr. 207:2-5, Apr. 11, 2022.
[21] Ryan Tr. 207:2-5, Apr. 11, 2022 ("Q. The term Rex is a strong mark for use in real estate. A. Yes. Q. You wouldn't consider the term Rex to be a weak mark? A. No.").
[22] *Id*.
[23] Kiran Tr. 38:21-39:24, Apr. 11, 2022; PTX No. 270, Summary of Entity License Search; Ryan Tr. 147:22-149:1, Apr. 11, 2022.
[24] Ryan Tr. 169:4-172:5, 207:17-18, and 236: 22-237:11, Apr. 11, 2022; Stec Tr. 156:5-157:1, Apr. 12, 2022; PTX No. 81 Defendant's website.

provide the Services.  Defendant concedes it is using REX in connection with real estate services, just like Plaintiff.[25]   Defendant also acknowledges that it considers traditional real estate companies to be its competitors.[26]  It is hard to imagine how Defendant could dispute it is a real estate company when it has "Real Estate" in its name—just as Plaintiff does.  The assertion by Defendant that it is a technology company is patently absurd.  As a result, a reasonable jury could have found that this factor strongly supports a finding of likelihood of confusion as a matter of law.

### 4.    Plaintiff and Defendant Offer Real Estate Services to the Same Potential Consumers

The greater the overlap between retail outlets and consumers, the greater the possibility of confusion.  *Streamline,* 851 F.3d at 455.  Defendant offers its real estate services to owners of residential real estate, including investors, vacant lots, as well as apartment and multi-unit buildings with four or fewer units.[27]  Similarly, Plaintiff offers its real estate services to residential and commercial real estate owners, including investors, vacant land, apartments, and multi-unit buildings.[28]  Plaintiff's customers include individuals and groups of individuals, as well as business entities.[29]  Mr. Kiran testified at trial that Plaintiff's clients include individuals from nearly every state, as well as individuals from countries around the world (*e.g.* Mexico, Canada, Germany, and China).  In addition to providing its real estate services to individuals, Mr. Kiran testified that Plaintiff's clients also include groups of individuals coming together for a deal that the individuals

---

[25] Ryan Tr. 204:19-22, Apr. 11, 2022; Stec Tr. 176:14-177:13, Apr. 12, 2022.
[26] Stec Tr. 180:23-181:16, Apr. 12, 2022; Ryan Tr. 205:24-206:23, Apr. 11, 2022.
[27] S. Glendenning Tr. 127:20-23, Apr. 8, 2022; Ryan Tr. 137:14-16, 171:5-7, 211:22 -215:18 Apr. 11, 2022; DTX No. 293, U.S. Serial No. 87/303,446 Status and Trademark Documents.
[28] Rex Glendenning Tr. 122:23-123:3, Apr. 12, 2022; Kiran Tr. 17:20-18:5, Apr. 12, 2022; PTX No. 118, Residential Closing List
[29] Kiran Tr. 18:22-19:19, 20:8-22 Apr. 11, 2022.

could not do on their own.  A reasonable jury could have found that this factor favors a finding of likelihood of confusion.

### 5.    Plaintiff and Defendant Advertise Using the Same Media

"The greater the similarity in the advertising campaigns of the parties, the greater the likelihood of confusion."  *Streamline,* 851 F.3d at 455.  As Jack Ryan, Defendant's CEO, acknowledged, both companies advertise using newspapers, radio, through their website and using signs and open houses at properties.[30]  Furthermore, an Internet search for Rex Real Estate pulls up Plaintiff *and* Defendant's websites as top hits.[31]  *Jones v. Am. Council on Exercise*, 245 F. Supp. 3d 853, 864 (S.D. Tex. 2017); *Gorgeous Gals LLC V. Hey Gorgeous! Spa & Wellness, LLC*, No. 1:16-CV-903-RP, 2017 WL 5016036, at *7 (W.D. Tex. Nov. 2, 2017).  Both companies use billboards.[32]  Both companies have advertised in the Wall Street Journal.[33]  Therefore, a reasonable jury could have found that this factor supports a finding of a likelihood of confusion in Plaintiff's favor.

### 6.    Defendant Knew Plaintiff Was Using the Trademarks for Providing Real Estate Services

"Although not necessary to a finding of likelihood of confusion, a defendant's intent to confuse may alone be sufficient to justify an inference that there is a likelihood of confusion."  S*treamline,* 851 F.3d at 455.  Defendant's use of the mark with knowledge of the senior user's mark may give rise to a presumption that Defendant intended to cause public confusion.  *Id*.

---

[30] Ryan Tr. 173: 8-174:4, 207:6-8, Apr. 11, 2022; PTX No. 164, Dallas Innovates Article; DTX No. 1, Def. Response to Interrogatory No. 2, 6 and Ex. B; Sherese Glendenning Tr. 159:22-167:25, Apr. 8, 2022; Stec Tr. 89:2-22; 113:18-114:7; 159:22-164:9, Apr. 12, 2022.; PTX Nos. 80 and 167
[31] Kiran Tr. 33:25-35:1; Stec Tr. 161:20-163:10, Apr. 12, 2022; PTX No. 229, Stec Rebuttal Report Ex. 5; Ryan Tr. 197:15-200:13; DTX No. 40.
[32] S. Glendenning Tr. 160:9-18, Apr. 8, 2022; Stec Tr. 160:13-161:1, Apr. 12, 2022
[33] S. Glendenning Tr. 163:3-164:9, Apr. 8, 2022.

Defendant first became aware of Plaintiff *in June 2014* through a trademark search.[34]   This was before Defendant even conducted any business.[35]   Yet, Defendant proceeded to use the Trademarks in offering real estate services.   In November 2016, when discussing whether to try to buy the rexrealestate.com domain name from Plaintiff—which Defendant knew existed, was using the Trademarks and was located in Texas—Defendant referred to Plaintiff and Mr. Glendenning as "the one person who has had this name before us."[36]   In addition, before entering the Texas market in 2018, Defendant was told by the State of Texas that the name REX-Real Estate Exchange was not available in Texas.[37]   At that time, Defendant assumed that the mark REX was unavailable as well.[38]   As a result, Defendant only qualified to do business in Texas under the name "Rexchange Inc."[39]   Despite this, Defendant has always done business in Texas under the Trademarks instead of under the name that it qualified to do business under "Rexchange Inc."[40]   Defendant intended to cause public confusion because it knew of Plaintiff's earlier use of the Trademarks and used the Trademarks despite being told by the State of Texas that the Trademarks were unavailable for use in Texas.   Defendant's corporate representative witness denied knowing about Plaintiff in their 2019 depositions.[41]   Accordingly, a reasonable jury could have found that this factor strongly favors a finding of likelihood of confusion in Plaintiff's favor.

---

[34] PTX No. 84, Response to Interrogatory No. 14; PTX No. 85, Def. Response to Plaintiff's Request for Admission No. 10 (Defendant was aware of Plaintiff's trademark and website before 2015); Ryan Tr. 236:22-239:1. Apr. 11, 2022.
[35] PTX No. 34, Certificate of Incorporation (June 2014); PTX No. 84, Def. Response to Interrogatory No. 1 (started business in May 2015).
[36] PTX No. 47-49, Domain Emails [DEF004300-03].
[37] Ryan Tr. 167:1-170:19, Apr. 11, 2022; PTX No. 56, Qualification to do Business.
[38] *Id*.
[39] *Id*.
[40] Ryan Tr. 169:4-172:5, Apr. 11, 2022.
[41] Ryan Tr. 146:17-147:21, Apr. 11, 2022.

### 7.      Plaintiff Provided Substantial Evidence of Actual Confusion

Evidence that consumers have been actually confused "may be the best evidence of a likelihood of confusion." *Streamline,* 851 F.3d at 457; *Waterloo Sparkling Water Corp. v. Treaty Oak Brewing and Distilling Co., LLC*, No. 1:21-CV-161-RP, 2021 WL 5568159, at *9 (W.D. Tex., Nov. 24, 2021). The Fifth Circuit has set a very low bar for this showing and there need only be very little proof of actual confusion to prove likelihood of confusion. *Id*. The Court cannot ignore even minor and isolated anecdotes. *Id*. Actual confusion that is dissipated by further inspection and does not result in an actual purchase is still relevant. *Elvis Presley Enter. Inc. v. Capece*, 141 F.3d 188, 204 (5th Cir. 1998). If there is proof of actual confusion, the defendant must provide "an almost overwhelming amount of proof to refute such proof." *Streamline,* 851 F.3d at 457.

Plaintiff presented extensive evidence of actual consumer confusion, as summarized and evidenced in the Trial Exhibits. Defendant obtained its real estate license in Texas on February 23, 2018 and started advertising in Texas shortly thereafter.[42] Within a couple of months, Plaintiff started receiving calls from consumers who believed Plaintiff and Defendant were the same company.[43] Plaintiff's receptionist Danielle Gervasi documented many instances of confusion, which are summarized in the attached Exhibit C, Summary of Instances of Actual Confusion.

This evidence of actual confusion alone is sufficient for a reasonable jury to find a likelihood of confusion. In *Armco,* the Fifth Circuit upheld the trial court's finding of trademark infringement because plaintiff's employee testified "he had received phone calls at least once a month from people trying to reach" the defendant. *Armco*, 693 F.2d at 1160. Defendant testified to multiple instances of actual confusion whereby third parties contacted Defendant regarding real

---

[42] PTX No. 192, TREC license.
[43] PTX No. 68, 80, and 181-184, Call sheets.

estate services in North Texas after seeing Plaintiff's public marketing efforts depicting its Trademarks.  These instances include email solicitations addressed to "Rex Glendenning" sent to Defendant by commercial real estate marketing firm Turnvest Marketers on May 8, 2018,[44] May 10, 2018,[45] May 1, 2019,[46] May 2, 2019,[47] May 7, 2019,[48] May 8, 2019,[49] May 13, 2019,[50] May 14, 2019,[51] and August 30, 2019.[52] Defendant also received real estate industry email solicitations addressed to "Rex Glendenning" from SiteSeer Technologies on May 8, 2018,[53] Hollwich Kushner on May 10, 2018,[54] and TC Global Commercial Real Estate on August 30, 2019.[55]  Defendant may have had additional emails of actual confusion, but such potential emails were lost in 2018.[56]

Defendant additionally confirmed examples of actual confusion.[57]  Defendant received web chat inquiries from consumers who were confused to believe that Defendant and Plaintiff were the same entity.  In a web chat communication received by Defendant on May 14, 2019, one consumer inquired about real estate parcels for sale in the Dallas / Fort Worth metroplex on the basis of Rex Real Estate signs observed in that region.[58] In another web chat, just a few minutes later a consumer asked if they had a department that brokered vacant land because they had signs up in Prosper for large parcels of land.[59] When informed that Defendant was not in the Dallas area and did not sell

---

[44] PTX No. 94, Compilation E-mails to Rex Glendenning (DEF 004304).
[45] *Id*. (DEF 004305 - 4307).
[46] *Id*. (DEF 004308- 4310).
[47] *Id*. (DEF 004311- 4322).
[48] *Id*. (DEF 004323- 4330).
[49] *Id*. (DEF 004331- 4339 and DEF 004340- 4347).
[50] *Id*. (DEF 004348-4358).
[51] *Id*. (DEF 004359 – 4372).
[52] *Id*. (DEF 004304-4376).
[53] *Id*. (DEF 004304).
[54] *Id*. (DEF 004305 – 4307).
[55] *Id*. (DEF 004373 – 4376).
[56] Ryan Tr. 188:3-194:3, Apr. 11, 2022.
[57] PTX No. 53-D (letter from Defendant's counsel Holly Pranger complainin to a third party of actual confusion because of use of REX mark)
[58] PTX No. 95, Chat Logs [DEF 003810].
[59] *Id*. [DEF 003810].

land, the consumer told them that "another" company was using Defendant's name and that they should look into it.[60]  Another chat request regarding whether Defendant brokers vacant land came in just a couple of hours later.[61]  On September 13, 2018 Defendant had a web chat communication with an individual who contacted them seeking Rex Glendenning's telephone number.[62]

> ### 8.      Potential Purchasers of Real Estate Are Not Sophisticated With Regards to Real Estate Services

When services are relatively inexpensive, consumers may take less care in selecting them, thereby increasing the risk of confusion.  *Streamline,* 851 F.3d at 458.  However, a high price alone does not negate other factors, particularly when the goods and marks are similar.  *Id*.  The United States Trademark Trial and Appeal Board has found that average homeowners are surprisingly unsophisticated when selecting a residential real estate agent.  *Real Estate One, Inc. v. Real Estate 100 Enter. Corp*., 212 USPQ 957, 959 (TTAB 1981).  This is because at the time of listing, the setting is casual (usually in the seller's home), non-competitive (seller does not often compare services of other brokers), and more often than not based on "general impressions rather than any hard analysis of, or comparison with, the quality of competitive brokerage services."  *Id*. (finding Real Estate 100 confusingly similar to Real Estate One).

Based on the evidence presented at trial, all of the factors related to the likelihood of confusion support a reasonable jury rendering a verdict in Plaintiff's favor on this issue.

## V.      A REASONABLE JURY COULD HAVE FOUND THAT PLAINTIFF IS ENTITLED TO AN AWARD OF DAMAGES

### A.      Plaintiff is Entitled to an Award of Damages because of Defendant's Infringement of Plaintiff's Trademarks

---

[60] *Id*.

[61] *Id*.

[62] PTX No. 193, Def. Amended Response to Interrogatory No. 8; PTX No. 78, Chat logs [DEF 004069].

In *ProTradeNet, LLC*, the Court acknowledged that the Lanham Act sets forth the multiple approaches to calculating damages, including: "(1) the trademark owner's damages, which can include lost profits, price erosion damages, damage to the mark, and corrective advertising; (2) reasonable royalty; (3) disgorgement of the infringer's profits...." *ProTradeNet, LLC v. Predictive Profiles, Inc.*, No. 6:18-CV-38-ADA, 2020 WL 5510732, at *16 (W.D. Tex. Mar. 10, 2020). Because Plaintiff presented evidence sufficient for a reasonable jury to award these damages, the Court should have denied Defendant's Rule 50(a) motion.

### 1.   A Reasonable Jury Could Award Plaintiff Damages for Corrective Advertising

Plaintiff is entitled to corrective advertising damages based upon the evidence presented at trial. Specifically, Plaintiff is entitled to recover remedial payment from Defendant for Plaintiff's anticipated costs of advertisements and other remedial measures to address and end consumer confusion and damage caused by Defendant's infringement of Plaintiff's Trademarks.

In determining the amount of a corrective damages award, the following are to be considered: (1) where the infringing mark was used (e.g. website, social media, paid search/banner ad campaigns, billboards, radio ads, etc.) and for how long; (2) the scope of corrective advertising by Plaintiff necessary to correct consumers' association with Defendant's services and infringing use of Plaintiff's marks; and (3) Plaintiff's costs associated with deploying such corrective advertising. 3A Fed. Jury Prac. & Instr. §159:91 (6th ed.).

Actual Damages arising from the need for corrective advertising are properly awarded for future expenditures to occur after the entry of an appropriate injunction. *In ProTradeNet, LLC*, the Court found that the plaintiff "must engage in extensive corrective advertising once [defendant's] infringing activities has been restrained by the permanent injunction issued below." *ProTradeNet, LLC*, 2020 WL 5510732, at *10. The Court acknowledged that "Courts have

awarded damages for prospective corrective advertising." *Id*. at *17.  The Court further held that "Given [defendant's] ongoing infringement..., it was reasonable for [plaintiff] to refrain from any corrective advertising until [defendant's] infringing activities have ceased." *Id*. at *10.  The Court acknowledged that the amount of corrective advertising can be the amount spent in 1 year in advertisement or 25% of the amount spent in the marketplace. *Id*. at *17.  In this case, Defendant spent $72,654,603.50 on marketing under the REX name,[63] which indicates an appropriate corrective advertising award of $18,163,650.

Plaintiff presented sufficient evidence at trial on each of the corrective damages factors justifying such compensatory damages.  First, Defendant used marks *identical* to those of Plaintiff in the same marketing channels for an extended period of time.[64]  Second, Plaintiff presented evidence at trial of not only actual consumer confusion,[65] but also of instances of Defendant's negative reputation that could harm Plaintiff due to occurrences of actual consumer confusion.[66] Finally, Plaintiff's expert testified that it would cost roughly $410,000 to undo the harm caused by Defendant's infringement.[67]  Plaintiff's founder, Rex Glendenning, testified that corrective advertising expenditures of approximately $1,000,000 per year for a period of 3 to 4 years would be required in order to remediate the harm and actual confusion caused by Defendant's infringement of Plaintiff's Trademarks.[68]  *Cf. Illinois Tool Works, Inc. v. Rust-Oleum Corp.*, 955

---

[63] DTX No. 351.

[64] Ryan Tr. 169:4-172:5, 173: 8-174:4, 207:6-8, 207:17-18, and 236: 22-237:11, Apr. 11, 2022; Sherese Glendenning Tr. 159:22-167:25, Apr. 8, 2022; Stec Tr. 156:5-157:1, 160:13-161:1, Apr. 12, 2022; PTX No. 81 Defendant's website; PTX No. 164, Dallas Innovates Article; DTX No. 1, Def. Response to Interrogatory No. 2, 6 and Ex. B.

[65] Gervasi Tr. 69:19-71:4, Apr. 12, 2022; PTX No. 68, 80, and 181, Call Sheets; PTX No. 255, Plaintiff's Amended Objections and Responses to Defendant's First Set of Interrogatories

[66] DTX No. 225, "As a buyer this was a terrible experience. Awful company. Buyers have to deal with multiple people who don't do their jobs well. To sum it up, agents are either inexperienced or sloppy and make lots of mistakes, and you get very little help or guidance if any. Some also mislead you…"; DTX No. 406, "Thus, my current assessment is that REX is a tremendous scam . . .", "REX failed to deliver on a range of promised services in the sale of my house, and provided misleading information critical to the transaction."

[67] Stec Tr. 182:19-21 and 195:15-197:2, Apr. 12, 2022.

[68] Rex Glendenning Tr. 90:19-21, Apr. 12, 2022.

F.3d 512, 516 (5th Cir. 2020) (plaintiff did not say what corrective advertising would cost or provide methodology for how amount was determined).

Plaintiff presented evidence for a reasonable jury to conclude that Plaintiff is entitled to some amount of corrective advertisement damages, including an amount from $410,000 to $4,000,000.

### 2.    A Reasonable Jury Could Award Plaintiff a Reasonable Royalty Fee

The Fifth Circuit allows a plaintiff to recover a reasonable royalty fee for trademark infringement by a defendant. *Streamline*, 851 F.3d at 459; *Brennan's Inc. v. Dickie Brennan & Co. Inc.*, 376 F.3d 356, 371 (5th Cir. 2004); *Haas Outdoors, Inc. v. Dryshot Intern., LLC*, No. 1:18-cv-596-RP, 2020 WL 5366292, at *1-3 (W.D. Tex. Sept. 8, 2020); *ProTradeNet, LLC*, 2020 WL 5510732, at *18-19. The royalty fee is based on a hypothetical negotiation between a willing trademark owner and willing licensee on the date the infringement began. *Streamline*, 851 F.3d at 459; *Brennan's*, 376 F.3d at 371; *ProTradeNet, LLC*, 2020 WL 5510732, at *17.

Plaintiff's expert, Dr. Jeffrey A. Stec, testified that Plaintiff is entitled to an award of reasonable royalty damages in the amount of $2,967,644 due to Defendant's infringement of Plaintiff's Trademarks, with such damages being calculated based upon a 6% royalty rate applied to Defendant's total revenue of $49,460,736 from 2015 through 2021 as a royalty base.[69] Dr. Stec explained the basis for, and how he calculated, the royalty amount.[70] A reasonable jury could certainly accept Dr. Stec's analysis and calculation of the royalty fee. Alternatively, a reasonable jury could have accepted Dr. Stec's 6% royalty rate and applied it to Defendant's Texas revenues of $3,182,126 to get a royalty in the amount of $190,927.

---

[69] PTX No. 266 Updated Supplemental Expert Report of Jeffery A. Stec Ph.D.; Stec Tr. 197:3 - 202:22
[70] *Id.*

Defendant incorrectly states that "The record is devoid of evidence that anyone in a hypothetical negotiation would pay a cent to license the 'Rex' name from Plaintiff nationwide." First, the record clearly shows that Defendant was willing to pay for, and in fact did purchase third party Azavea's "Rex" mark (which was for use in software) for a flat fee of $7,500.[71]  Second, Mr. Ryan testified at trial that Defendant considered purchasing one of Plaintiff's web addresses featuring the "Rex" name.[72]  Defendant refused to pay $2 million for the www.rex.com domain. Third parties have approached Plaintiff and inquired as to franchising and/or selling Plaintiff.[73] Plaintiff's three examples demonstrate that the Rex name is desirable and considered valuable by many, including Defendant.

Accordingly, Plaintiff presented sufficient evidence for a reasonable jury to award reasonable royalty damages.

### 3.    A Reasonable Jury Could Award Plaintiff the Profits of Defendant

Under Section 1117(a) of the Lanham Act, a plaintiff is "only 'required to prove [Defendant's] sales'—that is, his gross revenues; Defendant bears the burden of proving his costs and deductions." *Heartbrand Holdings, Inc. v. Whitmer*, No. SA-19-CV-358-HJB, 2021 WL 1947875, at *5 (W.D. Tex. May 14, 2021) (citing 15 U.S.C. § 1117(a)); *Lowe v. Eltan, B.V*., 2018 WL 7822940, at *9 (E.D. Tex. 2018) (*citing Choice Hotels, Int'l. Inc. v. Patel*, 940 F. Supp. 2d 532, 544 (S.D. Tex. 2013))  Although evidence shows Defendant's willful intent to infringe Plaintiff's Trademarks, the Supreme Court has held that such evidence, while relevant, it is not a prerequisite for an award of the defendant's profits.  *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1494 (2020).

---

[71] PTX Nos. 38 and 40; Ryan Tr. 112:3-117:7, Apr. 11, 2022.
[72] PTX No. 47; Ryan Tr. 142:14-114:16, Apr. 11, 2022.
[73] R. Glendenning Tr. 96:21-97:7 and 106:24-107:7, Apr. 12, 2022.

Plaintiff presented evidence that Defendant's revenues associated with its unjust enrichment from Defendant's infringement of Plaintiff's Trademarks from 2015 through 2021 totaled $49,460,736.[74]  Plaintiff also presented evidence that Defendant's revenues associated with just its unjust enrichment in Texas was $3,182,126.[75]  Dr. Stec also testified that for at least a short period just in connection with Texas, there was evidence that Defendant's allowable costs were 33%.[76]  A reasonable jury could have applied this 66% profit margin to all the national revenue or Texas revenue to reach a disgorgement amount of $32,644,085 or $2,100,203 respectively.  This evidence, therefore, *alone* is sufficient to deny Defendant's Rule 50(a) motion since there is sufficient evidence for a reasonable jury to award Plaintiff damages based on Defendant's profits.

Defendant did not present any evidence of any costs that should be deducted from the damages calculation.

## B.   Plaintiff is Entitled to a Finding of Willfulness and Attorneys' Fees

According to the Fifth Circuit, a defendant acts willfully if "he knows his actions constitute an infringement."  *Broad. Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 236 (5th Cir. 1988); *Philip Morris USA Inc. v. Lee*, 549 F. Supp. 2d 839, 851 (W.D. Tex. Apr. 8, 2008).  The willful conduct must be proved by "clear and convincing evidence."  *Microsoft Corp. v. Software Wholesale Club, Inc.*, 129 F. Supp 995, 1005 (S.D. Tex. Dec. 15, 2000).  If the defendant's actions rise to the level of reckless disregard for, or willful blindness toward, a trademark owner's rights, then the defendant will be considered acting with constructive knowledge of infringement equivalent to willful conduct.  *Epic Tech, LLC v. Lara*, No. 4:15-CV-01220, 2017 U.S. Dist. LEXIS 196705, at *15 (S.D. Tex. Nov. 30, 2017); *Philip*, 549 F. Supp. 2d at 851; *Berg v. Symons*, 393 F. Supp. 2d

---

[74] PTX No. 266 Updated Supplemental Expert Report of Jeffery A. Stec Ph.D.
[75] PTX No. 128, Defendant's Austin and San Antonio Revenue 2018-2021; DTX No. 351, Defendant's Consolidated Statement of Operations; Stec Tr. 186:14-187:5, Apr. 12, 2022.
[76] Stec Tr. 195:5-196:1, Apr. 12, 2022.

525; 539-40 (S.D. Tex. Sept. 30, 2005).  When considering whether a party's conduct has risen to the level of reckless disregard or willful blindness, the actions must be more than an "accidental encroachment on another's rights."  *A Touch of Class Jewelry Co. v. J.C. Penney Co.*, No. 98-2949, 2000 U.S. Dist. LEXIS 12898, at 17 (E.D. La. Aug. 28, 2000) (quoting *SecuraComm Consulting Inc. v. Securacom Inc.*, 166 F.3d 182 (3rd Cir. 1999)); *Philip*, 549 F. Supp. 2d at 851.

To reach the "reckless disregard" standard, there must be an intent to infringe, or a deliberate disregard for the trademark holder's rights.  *Id*.  Determining whether an infringer has acted with "willful blindness" is a subjective inquiry.  *Philip*, 549 F. Supp. 2d at 851; *Hard Rock Café Licensing Corp. v. Concession Servs.*, 955 F.2d 1143, 1151 n.5 (7th Cir. 1992).  Often, the court will focus on what the infringer suspected, and what the infringer did with that suspicion.  *Id*.  The Fifth Circuit has previously held that a defendant acted with willful blindness when he was aware there was a high probability of existing illegal conduct and intentionally avoided learning of the illegal conduct.  *United States v. Scott*, 159 F.3d 916, 922 (5th Cir. 1998); *Philip*, 549 F. Supp. 2d at 851.

Here, Plaintiff presented substantial evidence at trial demonstrating that Defendant knew about Plaintiff and its Trademarks but continued to knowingly and deliberately infringe Plaintiff's Trademarks and confuse consumers.  At a minimum, the evidence Plaintiff presented at trial shows that Defendant acted with a reckless disregard or willful blindness.  Specifically, Mr. Ryan testified that in 2014 Defendant's attorney conducted a search of the PTO's records and informed Defendant about Plaintiff's Trademarks.[77]  Defendant was also aware of Plaintiff and its confusing similarity when discussing whether Defendant should pursue purchasing one of Plaintiff's web addresses because "it would solve a lot of [Defendant's] URL brand issues without major

---

[77] PTX No. 1, Rex Real Estate Trademark Registration; Ryan Tr. 85:12-87:20, Apr. 11, 2022.

expense."[78]   Defendant also knew about Plaintiff, Plaintiff's Trademarks, and their confusingly similar nature when the Texas Secretary of State informed Defendant that it could not do business in Texas as "Rex Real Estate Exchange" because "that corporation name is not available in Texas," due to Plaintiff.[79]   Despite the denial of its corporate registration for the confusingly similar Rex name, Defendant proceeded to market itself and do business as Rex in the State of Texas, all the while knowing that it did not have the authority to do so because another company (Plaintiff) was already doing business under this name.[80]   Moreover, Plaintiff sent Defendant a demand letter identifying Defendant's infringement and confusingly similar use of Rex, and even filed suit, yet Defendant continues to willfully infringe.[81]   Lastly, in Defendant's trademark application and corresponding communication with the PTO, Defendant conveniently omitted the fact that its mark would be used in real estate brokerage services, likely because it knew such inclusion would invite an opposition from Plaintiff.[82]   All of this combines to show that Defendant's willful infringement makes this an exceptional case and easily satisfies the willfulness standard.

## VI.   DEFENDANT'S OTHER ARGUMENTS LACK MERIT

### A.   Defendant Did Not Obtain Trademark Rights From Third Party Azavea

A reasonable jury could also certainly find that Defendant is not entitled to claim any benefit, including any priority, from Third Party Azavea's earlier use of the word "Rex" for unrelated software used only in Pennsylvania and surrounding locations.  As the evidence at trial established, Azavea assigned nothing more than the trademark itself.  Without the requisite

---

[78] PTX No. 47, e-mail from Jack Ryan to Ari Sternberg dated Nov. 21, 2016; Ryan Tr. 142:14-144:16, Apr. 11, 2022.
[79] PTX No. 56, Defendant's Application for Registration of a Foreign For-Profit Corporation; Ryan Tr. 167:1-168:7, Apr. 11, 2022.
[80] Ryan Tr. 169:4-171:7, Apr. 11, 2022.
[81] PTX No. 59, Plaintiff's Demand Letter.
[82] DTX No. 283, U.S. Trademark Application Serial Number 87/550,333; Ryan Tr. 211:2-23, Apr. 11, 2022.

goodwill that the mark represents, the assignment of the trademark is invalid.  At trial, Defendant admitted that it acquired "[j]ust the trademark" from Azavea and Defendant "didn't acquire any other asset from the seller" Azavea.[83]

Regardless, Azavea had abandoned the trademark almost four years before it was purportedly assigned to Defendant and, therefore, any alleged ownership transfer to Defendant from Azavea was invalid for this separate and additional reason.[84]

Azavea ceased use of the REX mark in commerce in connection with its software at least *by March 2010*.[85]  Azavea's software was web-based, accessed only through Azavea's domain name and was not downloadable or distributed to customers.[86]  No one could access the software without knowing the direct URL and having an account.[87]  Initially, Azavea advertised the software on its website and had a direct link to the software URL there.[88]  However, Azavea relaunched its website in March of 2010.[89]  After the website was relaunched, the REX project was only mentioned on the research projects section of Azavea website, but no link to access it was provided.[90]  At that point, customers could only access the software if they asked Azavea about the software to learn of the direct link to use it.[91]  There is no evidence that any customer ever made any such inquiry.[92]  By March 2010, there were also no paying subscribers for the software or sales of reports generated using the software bearing the REX mark.[93]  Nor is there

---

[83] Ryan Tr. 127:9-24, Apr. 11, 2022; PTX No. 40.
[84] PTX No. 38, Notes on Acquisition of REX Mark from Azavea; Ryan Tr. 112:3-114:4, Apr. 11, 2022.
[85] PTX No. 207, Trademark Assignment Name Change Avencia to Azavea; Ryan Tr. 55:4-16, Apr. 12, 2022.
[86] Cheetham Tr. 43:16-44:19.
[87] *Id*. at 80:10-14.
[88] *Id*. at 31:22-32:2.
[89] *Id*. at 69:23-70:15.
[90] *Id*. at 31:22-33:15.
[91] *Id*. at 32:18-33:15.
[92] *Id*. at 32:18-33:15.
[93] *Id*. at 81:17-22; *id*. at 33:16-34:3

any evidence that any free accounts were actually using the software bearing the REX mark after March 2010.[94]  Azavea kept the software running because it required less effort than shutting it down and with the knowledge that "no one was going to be able to find it."[95]  Thus, the evidence establishes that Azavea ceased commercial use of the software in March 2010 and did not have any intent to resume commercial use of the software.

Azavea's abandonment of the REX mark was almost four years before the purported assignment of the REX mark to Defendant on September 2, 2014.[96]  Thus, there is a prima facie case of abandonment.  *Exxon Corp. v. Humble Exploration Co., Inc.*, 695 F.2d 96, 99 (5th Cir. 1983).  Accordingly, Plaintiff has presented evidence whereby a reasonable jury could find in its favor on this issue.

## VIII.   CONCLUSION

The evidence presented at trial by Plaintiff was sufficient to support a verdict from a reasonable jury in favor of Plaintiff as to all issues.

---

[94] *Id*. at 103:6-14.
[95] *Id*. at 88:18-22.
[96] PTX No. 42, Trademark Purchase Agreement and Assignment.

Respectfully submitted,

Dated: May 13, 2022

/s/ Charles E. Phipps
Charles E. Phipps
Texas Bar No. 00794457
cphipps@lockelord.com
Mark R. Backofen
mbackofen@lockelord.com
Texas Bar No. 24031838
Robert E. Nail
Texas Bar No. 24025556
rnail@lockelord.com
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-6776
Telephone: (214) 740-8000
Facsimile: (214) 740-8800
Gregory Shamoun
Texas Bar No. 18089650
g@snlegal.com
SHAMOUN & NORMAN, LLP
1800 Valley View Lane, Suite 200
Dallas, Texas 75234
Telephone: (214) 987-1745
Facsimile: (214) 521-9033
David L. Foster
Texas Bar No. 24031555
dfoster@lockelord.com
LOCKE LORD LLP
600 Congress Ave., Suite 2200
Austin, Texas 78701
Telephone: (512) 305-4700
Facsimile: (512) 305-4800
Daniel A. Solitro
dsolitro@lockelord.com
LOCKE LORD LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071
Telephone: (213) 485-1500
Facsimile: (213) 485-1200
ATTORNEYS FOR PLAINTIFF
REX REAL ESTATE I, L.P.

# Exhibit A

**Archived:** Wednesday, May 11, 2022 12:46:41 PM
**From:** Molly Petchenik
**Mail received time:** Tue, 12 Apr 2022 13:50:26
**Sent:** Tue, 12 Apr 2022 18:50:19
**To:** aallen@wsgr.com  Foster, Dave  g@snlegal.com  Phipps, Charles  cbal@wsgr.com  Solitro, Daniel A.  dsavage@wsgr.com  jflynn@wsgr.com  jbaskin@wsgr.com  lily.miller@wsgr.com  Backofen, Mark R.  Nail, Robert  Nguyen, Daniel  PSandillo@wsgr.com
**Cc:** Julie Golden
**Subject:** 19-cv-696 Rex Real Estate - Draft Jury Charge
**Importance:** Normal
**Sensitivity:** None
**Attachments:**
19-cv- 696 - jury charge.docx;

---

**\*\* External Email -- Sender: Molly_Petchenik@txwd.uscourts.gov \*\***

Counsel:

Please find attached a draft jury charge for your review.

Thank you,
-Molly



**Molly Petchenik**
*Law Clerk*
Chambers of Honorable Robert Pitman
U.S. District Court
Western District of Texas
Austin Division
Chambers**: 512-391-8824**
Molly_Petchenik@txwd.uscourts.gov
Click our seal to visit the Texas Western District Court website

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| REX REAL ESTATE I, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:19-CV-696-RP |
| | § | |
| REX REAL ESTATE EXCHANGE INC., | § | |
| | § | |
| Defendant. | § | |

## JURY CHARGE

**MEMBERS OF THE JURY**:

It is my duty and responsibility to instruct you on the law you are to apply in this case. The law contained in these instructions is the only law you may follow. It is your duty to follow what I instruct you the law is, regardless of any opinion that you might have as to what the law ought to be.

If I have given you the impression during the trial that I favor either party, you must disregard that impression. If I have given you the impression during the trial that I have an opinion about the facts of this case, you must disregard that impression. You are the sole judges of the facts of this case. Other than my instructions to you on the law, you should disregard anything I may have said or done during the trial in arriving at your verdict.

You should consider all of the instructions about the law as a whole and regard each instruction in light of the others, without isolating a particular statement or paragraph.

## I. INSTRUCTIONS FOR THE JURY

The testimony of the witnesses and other exhibits introduced by the parties constitute the evidence. The statements of counsel are not evidence; they are only arguments. It is important for you to distinguish between the arguments of counsel and the evidence on which those arguments rest. What the lawyers say or do is not evidence. You may, however, consider their arguments in

light of the evidence that has been admitted and determine whether the evidence admitted in this

trial supports the arguments. You must determine the facts from all the testimony that you have

heard and the other evidence submitted. You are the judges of the facts, but in finding those facts,

you must apply the law as I instruct you.

Do not let bias, prejudice or sympathy play any part in your deliberations. A corporation and

all other persons are equal before the law and must be treated as equals in a court of justice.

You are required by law to decide the case in a fair, impartial, and unbiased manner, based

entirely on the law and on the evidence presented to you in the courtroom. You may not be

influenced by passion, prejudice, or sympathy you might have for the plaintiff or the defendant in

arriving at your verdict.

## INSTRUCTION NO. 1

### BURDEN OF PROOF: PREPONDERANCE OF THE EVIDENCE

Plaintiff has the burden of proving its case by a preponderance of the evidence. To establish

by a preponderance of the evidence means to prove something is more likely so than not so. If you

find that Plaintiff has failed to prove any element of its claim by a preponderance of the evidence,

then it may not recover on that claim.

## INSTRUCTION NO. 2

### EVIDENCE

The evidence you are to consider consists of the testimony of the witnesses, the documents

and other exhibits admitted into evidence, and any fair inferences and reasonable conclusions you

can draw from the facts and circumstances that have been proven.

Generally speaking, there are two types of evidence. One is direct evidence, such as

testimony of an eyewitness. The other is indirect or circumstantial evidence. Circumstantial evidence

is evidence that proves a fact from which you can logically conclude another fact exists. As a general

rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

## INSTRUCTION NO. 3

### WITNESSES

You alone are to determine the questions of credibility or truthfulness of the witnesses. In weighing the testimony of the witnesses, you may consider the witness's manner and demeanor on the witness stand, any feelings or interest in the case, or any prejudice or bias about the case, that he or she may have, and the consistency or inconsistency of his or her testimony considered in the light of the circumstances. Has the witness been contradicted by other credible evidence? Has he or she made statements at other times and places contrary to those made here on the witness stand? You must give the testimony of each witness the credibility that you think it deserves.

Even though a witness may be a party to the action and therefore interested in its outcome, the testimony may be accepted if it is not contradicted by direct evidence or by any inference that may be drawn from the evidence, if you believe the testimony.

You are not to decide this case by counting the number of witnesses who have testified on the opposing sides. Witness testimony is weighed; witnesses are not counted. The test is not the relative number of witnesses, but the relative convincing force of the evidence. The testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses testified to the contrary, if after considering all of the other evidence, you believe that witness.

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field is permitted to state his or her opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to decide whether to rely on it.

## INSTRUCTION NO. 4

## DEPOSITION TESTIMONY

Certain testimony has been presented to you through a deposition. A deposition is the sworn, recorded answers to questions a witness was asked in advance of the trial. Under some circumstances, if a witness cannot be present to testify from the witness stand, that witness's testimony may be presented, under oath, in the form of a deposition. Sometime before this trial, attorneys representing the parties in this case questioned this witness under oath. A court reporter was present and recorded the testimony. This deposition testimony is entitled to the same consideration and is to be judged by you as to credibility and weighed and otherwise considered by you in the same way as if the witness had been present and had testified from the witness stand in court.

## INSTRUCTION NO. 5

## STIPULATION OF FACT

A "stipulation' is an agreement. When there is no dispute about certain facts, the attorneys may agree or "stipulate" to those facts. You must accept a stipulated fact as evidence and treat that fact as having been proven here in court.

## INSTRUCTION NO. 6

## CHARTS AND SUMMARIES

Certain charts and summaries have been shown to you solely to help explain or summarize the facts disclosed by the books, records, and other documents that are in evidence. These charts and summaries are not evidence or proof of any facts. You should determine the facts from the evidence.

## INSTRUCTION NO. 7

## LIMITING INSTRUCTION

When testimony or an exhibit is admitted for a limited purpose, you may consider that testimony or exhibit only for the specific limited purpose for which it was admitted.

**INSTRUCTION NO. 8**

**LAWSUIT**

The fact that a person brought a lawsuit and is in court seeking damages creates no inference that the person is entitled to a judgment. Anyone may make a claim and file a lawsuit. The act of making a claim in a lawsuit, by itself, does not in any way tend to establish that claim and is not evidence.

**II. CLAIM INSTRUCTIONS**

**INSTRUCTION NO. 9**

**TRADEMARK GENERALLY**

A trademark or service mark is a word, name, symbol, or device, or any combination of these items that indicates the source of goods or services. The owner of a trademark has the right to exclude others from using that trademark or a similar mark that is likely to cause confusion in the marketplace.

The first person or company to use a trademark in the marketplace as a source of origin acquires the right to prevent others from using the same or a similar mark for similar or related services that is likely to cause confusion in the marketplace.

**INSTRUCTION NO. 10**

**TRADEMARK INFRINGEMENT**

In an action for trademark infringement, the owner of a valid mark may enforce the right to prevent others from using the same or a similar mark for similar or related services that is likely to cause confusion in the marketplace. Anyone who, without the consent of the owner of a valid mark, uses the same or a similar mark in connection with the sale or offering for sale of services in a manner likely to cause confusion among consumers as to the source, affiliation, or sponsorship of goods or services, infringes the mark.

On Plaintiff's claim for trademark infringement, Plaintiff has the burden of proving each of the following elements by a preponderance of the evidence:

1. Plaintiff's asserted trademarks are valid, protectable trademarks;

2. Plaintiff owns priority in its trademarks; and

3. Defendant uses Plaintiff's trademarks without the consent of Plaintiff in a manner that is likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation, or approval of the services.

Further instructions will explain to you in detail what Plaintiff must prove to establish each of these elements.

If you find that Plaintiff has proved each of these elements by a preponderance of the evidence, your verdict should be for the Plaintiff. If, on the other hand, Plaintiff has failed to prove any of these elements, your verdict should be for Defendant.

## INSTRUCTION NO. 11

## TRADEMARK VALIDITY

The first consideration in an infringement lawsuit like this is for you to determine whether Plaintiff's mark is valid, which requires you to consider the marks' distinctiveness. To determine if Plaintiff has met its burden of showing that REX, REX REAL ESTATE and REX REAL ESTATE (and design) is a valid trademark, you must first classify it on the spectrum of trademark distinctiveness.

Trademarks are categorized along a range of distinctiveness, called the "distinctiveness spectrum": (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. A mark's placement on this spectrum determines whether and how it is entitled to legal protection. Marks that are suggestive, arbitrary, or fanciful are deemed inherently distinctive and are entitled to protection because their intrinsic nature serves to identify a particular source of a product or service. In

6

contrast, descriptive marks are not inherently distinctive and may only be protected upon a showing of acquired distinctiveness, also known as "secondary meaning." Generic marks may never be protected.

Arbitrary or Fanciful Marks: Marks in these categories use an arbitrary, fanciful, or fictitious word or symbol to designate the source of the product or service. Such a trademark is a word that in no way describes the particular product or service it is meant to identify. It may be a common word used in an unfamiliar way. It may be a newly created word or parts of common words that are applied in a fanciful, fictitious, or unfamiliar way, solely as a trademark. A mark that is either arbitrary or fanciful is considered to be inherently distinctive and clearly protectable.

Suggestive Marks: Suggestive marks imply some characteristic or quality of the product or service to which they are attached. If the consumer must use imagination or any type of multi-stage reasoning to understand the mark's significance, then the mark does not describe the features of the product or service, but suggests them.

Descriptive Marks: These marks directly identify some characteristic of the products to which they are attached such that the average consumer would have little problem understanding the association between the mark and the product. Descriptive trademarks are entitled to protection only if they have acquired secondary meaning in the minds of consumers.

Generic Marks: A mark is generic if it does not identify the source of a product or service, but instead uses the common word or words that an average consumer would use to identify what the product or service is. Generic marks are entitled to no protection.

These are the categories for you to consider in determining whether each of the REX, REX REAL ESTATE and REX REAL ESTATE (and design) is a valid trademark.

If you decide that the mark is arbitrary, fanciful, or suggestive, it is considered inherently distinctive. An inherently distinctive trademark is valid and protectable.

If you decide that the mark is descriptive, you will not know if the trademark is valid until you consider whether it has gained distinctiveness by acquiring secondary meaning. Personal names are descriptive and require proof that they have achieved secondary meaning.

## INSTRUCTION NO. 12

## SECONDARY MEANING

A mark that is not inherently distinctive is valid and entitled to legal protection if the mark has acquired a "secondary meaning." A trademark has acquired secondary meaning where the primary significance of the trademark to the general public is to uniquely identify a party's products or services. Plaintiff must show that its marks have achieved secondary meaning across the United States.

Whether a mark has a "secondary meaning" depends on the recognition that the mark has among prospective purchasers. A mark has a secondary meaning when the public associates it with a single source of a service even though the mark itself does not distinguish the service. When a mark is unregistered, the burden is on the mark owner to prove by a preponderance of the evidence that a significant number of the consuming public associates the mark with a single source. If mark owner does this, then the mark has a secondary meaning. The mere fact that a mark owner uses a mark does not mean that the trademark has acquired secondary meaning. If a word is widely used by others, particularly in the same or similar industry, that lack of exclusivity is a factor that cuts against finding secondary meaning.

If you decide that one more of Plaintiff's REX, REX REAL ESTATE and REX REAL ESTATE (and design) marks are not inherently distinctive, the following factors may be considered in determining whether the marks have secondary meaning:

1. Whether people who purchase the services offered and marketed under the trademark associate the trademark with Plaintiff;

8

2. Whether Plaintiff has advertised under the claimed trademark;

3. Whether Plaintiff used this trademark to increase its sales;

4. Whether Plaintiff, its licensees, or the public have used the claimed trademark for an extended period of time;

5. Whether Plaintiff's use of the claimed trademark was exclusive;

6. Whether Defendant intentionally copied the trademark; and

7. Whether Defendant's use of the trademark has led to actual confusion.

It is not necessary that you find all or most of the factors to determine secondary meaning.

## INSTRUCTION NO. 13

## LIKELIHOOD OF CONFUSION

To prove infringement, Plaintiff must prove, by a preponderance of the evidence, that Defendant, without Plaintiff's consent, used in commerce a reproduction, copy, counterfeit or colorable imitation of Plaintiff's mark in connection with the distribution or advertisement of goods or services, such that Defendant's use of the mark is likely to cause confusion as to the source of the goods or services. It is not necessary that the mark used by Defendant be an exact copy of Plaintiff's mark. Rather, Plaintiff must demonstrate that, viewed in its entirety, the mark used by Defendant is likely to cause confusion in the minds of reasonably prudent purchasers as to the source of the product or service in question. Likelihood of confusion means a probability of confusion. This is more than a mere possibility of confusion; it requires that confusion be more likely than not.

In evaluating whether or not there is a likelihood of confusion, you are to consider various factors. These factors are simply a guide to help you determine whether confusion is likely to result from simultaneous use of the two parties' marks. No single factor or consideration is dispositive, and Plaintiff need not prove that all, or even most, of the factors listed below are present to be successful. Nor are you limited to consideration of only these factors. You must consider and weigh

all of the relevant evidence in determining whether there is a likelihood of confusion. Factors you may consider include:

1. The type of trademark, which refers to the strength of the mark. Strong marks receive a broad level of protection under the trademark laws; weak marks receive a narrower range of protection. In evaluating the strength of Plaintiff's mark, you should not rely solely on the fact that Plaintiff has a registered trademark as an indicator of strength. A mark's strength is measured by both its inherent strength (its position along the distinctiveness spectrum) and by its acquired strength (the degree of consumer recognition it has obtained in the marketplace). The more distinctive a mark is, the stronger it is; conversely, the less distinctive a mark, the weaker it is. The more that purchasers or users associate plaintiff's trademark uniquely with a single source of a product or service, then the stronger plaintiff's mark is and the more likely it is that purchasers or users would be confused about the source of the products or services if defendant uses a similar mark. Extensive third-party use of the claimed mark weakens that trademark.

2. Mark similarity. Mark similarity is determined by comparing the marks' appearance, sound, and meaning. Similarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features. Even if two marks are distinguishable, you should consider whether, under the circumstances of use, the marks are similar enough that a reasonable person could believe the two products have a common origin or association. To determine the meaning and connotation of the marks, you should consider the context in which the marks are used.

3. Similarity of the products or services. If both parties use their marks to market the same, related, or complementary types of products or services, then the likelihood of confusion increases. If the parties' respective goods or services are unrelated, then the likelihood of confusion decreases. If the two parties are marketing different products, the probability that plaintiff will begin selling the

same, related or complementary products to defendant's must also be considered. If that probability is high, then the likelihood of confusion increases; conversely, if that probability is low, the likelihood of confusion decreases. You may consider, among other things, the types of properties each party sells—in this case for instance, commercial or residential real estate, the size of the lots, the typical price points, and so on.

4. Identity of the retail outlets and purchasers. The degree to which the two parties sell in the same or similar retail outlets or to the same or similar purchasers may have a bearing on the likelihood of confusion. The more similarity or overlap, the more there is a likelihood of confusion. You may consider the manner in which the parties offer their products and services, as well as their respective target markets and target customers. You may consider, among other things, *how* the parties offer their products and services—for example, whether they offer properties for sale via traditional listings or via an online search platform. You should also consider *who* the parties target as their typical consumers—for example, whether they target real estate investors or home buyers.

5. Advertising media identity. If the parties' respective products or services are likely to be sold in the same or similar channels of trade, are targeted at same or similar classes of customers, or are advertised in similar media, this may increase the likelihood of confusion. Conversely, if the parties' respective products or services are likely to be sold in different outlets, or to different classes of customers, or advertised in different media, this may reduce any likelihood of confusion.

6. Defendant's intent. If Defendant chose its mark with the specific intent to cause confusion by "passing off" its goods and services as those of Plaintiff, that cuts in favor of a likelihood of confusion. Conversely, if Defendant chose its mark in good faith and without an intent to cause confusion, then this factor cuts against a likelihood of confusion. To find a likelihood of confusion, it is not necessary that you find a defendant intended to confuse, infringe, or select a mark in use by a senior user. But if a defendant did intend to confuse, infringe, or select a mark in

11

use by a senior user, that alone may be sufficient for you infer that there is a likelihood of confusion. If there is an absence of intent, that does not weigh against a likelihood of confusion. It is merely a neutral factor weighing in neither direction.

7. Actual confusion. You should consider whether Plaintiff has demonstrated that Defendant's use of its mark produces confusion in potential customers. Generalized confusion is not what matters for this factor, but rather that customers bought goods or services from Defendant when they intended to do so from Plaintiff. The evidence must also show that any such mistaken purchasing decision was caused by the trademarks used Anecdotal evidence of confusion does not, without more, constitute evidence of actual confusion. Actual confusion is not required for you to find a likelihood of confusion. However, if Defendant's use of the mark has led to instances of actual confusion among relevant consumers, this may be a strong indication that confusion is likely. While very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof.

8. Care exercised by, or sophistication of, potential purchasers. Where items are relatively inexpensive, a purchaser may take less care in selecting the item, thereby increasing the risk of confusion. Buyers are more likely to be careful when buying expensive products or services and, consequently, less likely to confuse Defendant's products or services for those of Plaintiff. By the same logic, purchasers of inexpensive products or services are more likely to confuse one party's products or services for the others. However, a high price tag alone does not negate other indicia of likelihood of confusion, especially if the goods or marks are similar.

## INSTRUCTION NO. 14

## USE IN COMMERCE

Plaintiff may obtain trademark rights through actual use in commerce of any word, name, symbol or design, or combination thereof, to identify its services. A trademark is used in commerce

when it is used, among other ways customary in the trade, by displaying the mark in the advertising or sale of the services, including in the form of printed or online marketing materials featuring the mark such as signage, billboards and Internet advertisements or websites and the services are offered and sold in commerce. Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public.

In determining whether use in commerce is sufficient to create trademark rights, you should consider the totality of the circumstances. Use is sufficient to establish trademark rights if the use is public enough so that it identifies or distinguishes the services offered under the mark in an appropriate segment of the public as those of the person or company using the mark. If the mark is used in a genuine commercial transaction, and if the use is consistent and continuous, this is sufficient to establish trademark rights.

## INSTRUCTION NO. 15

## PRIORITY AND TRANSFER OF INTEREST

A party acquires the right to exclude others from using a trademark by being the first to use it in the marketplace or by using it before the alleged infringer. To establish priority of a descriptive mark, a party must establish secondary meaning in these marks prior to the alleged infringer's first use.

The owner of a trademark may transfer, give, or sell to another person the owner's interest in the trademark. This type of agreement is called an assignment, and the person who receives the owner's interest is called an assignee. The assignee becomes the owner of the mark and obtains all the rights in the trademark, including priority of use. An assignee has the right to exclude others from using the trademark or a similar mark that is likely to cause confusion in the marketplace. To

13

be enforceable, the assignment must be in writing and signed. It must also include the goodwill of the business connected with the trademark. An assignment includes the goodwill of the business when the party that received the assignment offers a service similar to that of the party that gave the assignment. The receiving party's significant expansion to products or services other than the ones offered by the assigning party does not make the assignment invalid. To be valid, an assignment need not transfer any physical or tangible assets.

In this case, Defendant entered into an assignment to purchase nationwide rights in the "Rex" trademark for "COMPUTER SOFTWARE FOR USE IN SEARCH AND DISPLAYING REAL ESTATE INFORMATION ON A GLOBAL COMPUTER NETWORK" from a company called Azevea. If you determine that this assignment was valid, you must assume that Defendant's first use of the mark was in 2002. If you determine that this assignment was invalid, you must assume that Defendant's first use of the mark was in 2015.

## INSTRUCTION NO. 16

### EFFECT OF FEDERAL REGISTRATION

An owner of a trademark may obtain a certificate of registration issued by the United States Patent and Trademark Office and may submit that certificate as evidence of the validity and protectability of the trademark and of the certificate holder's exclusive ownership of the trademark covered by that certificate. A trademark certificate of registration issued by the U.S. Patent and Trademark Office creates a presumption of registrant's exclusive right to use the mark in commerce in connection with the services or goods specified therein.

To prove infringement of a federally registered mark, Plaintiff must prove, by a preponderance of the evidence, that:

1. Plaintiff owns a mark that is registered with the U.S. Patent and Trademark Office; and

14

2. Defendant used in commerce, without Plaintiff's consent, a reproduction, copy, counterfeit, or colorable imitation of Plaintiff's mark in connection with the sale, offering for sale, distribution, or advertising of services, which use is likely to cause confusion.

To prevail on a claim of false designation of origin or infringement of an unregistered mark, Plaintiff must show, by a preponderance of the evidence, that:

1. Plaintiff is the owner of a valid mark through priority of use in commerce (in the case of an inherently distinctive mark), or through priority of acquisition of secondary meaning (in the case of a descriptive mark); and

2. Defendant's subsequent use in commerce, in connection with services, of a word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendant with Plaintiff, or as to the origin, sponsorship, or approval of their goods, services, or commercial activities by another person.

The term "origin," as used here, is not restricted to its geographical meaning, but rather, includes a representation regarding the origination of the services, such as from a particular seller. Whether Plaintiff's mark is registered or unregistered, it is not necessary that the mark used by Defendant be an exact copy of Plaintiff's mark. Rather, Plaintiff must demonstrate that, when viewed in its entirety, Defendant's use of the mark is likely to cause confusion in the minds of reasonably prudent purchasers or other relevant members of the public as to the source, origin, sponsorship, or approval of the services in question, or as to affiliation, connection or sponsorship.

A federal trademark registration becomes incontestable five years after the date of registration if an appropriate declaration is filed five years after the date of federal registration and that declaration is accepted by the United States Patent and Trademark Office. If a trademark registration has become incontestable, then lack of distinctiveness of such mark cannot be raised in litigation. That is, it is

conclusively presumed either that the mark is nondescriptive, or if it is descriptive, has acquired secondary meaning.

## III. DAMAGES

### INSTRUCTION NO. 17

### DAMAGES GENERALLY

If Plaintiff has proved its claim against Defendant by a preponderance of the evidence, you must determine the damages to which Plaintiff is entitled. You should not interpret the fact that I am giving instructions about Plaintiff's damages as an indication in any way that I believe that Plaintiff should, or should not, win this case. It is your task first to decide whether Plaintiff has protectable rights in its asserted "Rex" trademarks and, if so whether Defendant's use of its "Rex" trademarks infringes those rights. I am instructing you on damages only so that you will have guidance in the event you decide that Defendant is liable and that Plaintiff is entitled to recover money from Defendant.

If it proves trademark infringement, Plaintiff may recover any damages it sustained and may also recover Defendant's profits resulting from the infringement. Plaintiff must prove both causation and the amount of damages for an award of damages to be proper. With respect to causation, Plaintiff must show that any harm it claims to have suffered was caused by trademark infringement by the Defendant.

### INSTRUCTION NO. 18

### ACTUAL DAMAGES

Damages means the amount of money that will reasonably and fairly compensate Plaintiff for any injury you find was caused by the infringement, also referred to as "actual damages." If you find that Plaintiff has proven infringement and that infringement caused it injury, you must determine the amount of its actual damages. Plaintiff must prove the amount of its damages by a

preponderance of the evidence. In determining the amount of Plaintiff's actual damages, you may include any of the following categories you find proven by Plaintiff:

1. Any profits that Plaintiff would have earned from additional sales were it not for Defendant's infringement;

2. Any injury to Plaintiff's goodwill, including injury to its general business reputation.

3. Any expense Plaintiff incurred to in preventing customers from being deceived.

4. The cost of any corrective advertising Rex Real Estate might reasonably be required to engage in to correct any public confusion caused by the infringement.

5. A reasonable royalty rate for the infringement.

These elements of recoverable damages are cumulative, and you should be careful not to double count amounts that could be characterized under more than one element.

## INSTRUCTION NO. 19

## CORRECTIVE ADVERTISING

If it proves trademark infringement, Plaintiff may recover remedial payment from Defendant for Plaintiff's anticipated costs of advertisements and other remedial measures to address and end consumer confusion and damage caused by Defendant's infringement. In determining the amount of a corrective damages award, the following are to be considered: (i) where the infringing mark was used (e.g., website, social media, paid search/banner ad campaigns, billboards, radio ads, etc.) and for how long; (ii) the scope of corrective advertising by Plaintiff necessary to correct consumers' association with Defendant's services and infringing use of Plaintiff's marks; and (iii) Plaintiff's costs associated with deploying such corrective advertising.

## INSTRUCTION NO. 20

## REASONABLE ROYALTY

If you find that Plaintiff has proven infringement and that infringement caused it injury, you must determine whether Plaintiff is entitled to damages in the form of a reasonable royalty. Plaintiff must prove the amount of a reasonable royalty rate by a preponderance of the evidence. To determine a reasonable royalty rate you should consider the fair market value of the rights infringed, or, in other words, what a hypothetical license from Plaintiff might have charged Defendant for the rights infringed.

This should be an amount that is rationally related to the scope of the infringement. In other words, there must be a correlation between (1) the rights infringed and (2) the royalty damages awarded.

## INSTRUCTION NO. 21

### DEFENDANT'S PROFITS

In addition to actual damages, Plaintiff may recover any of Defendant's profits that are attributable to the infringement. You may not, however, include in any award Defendant's profits any amount that was already included in the amount of Rex Real Estate's actual damages.

In determining the amount of Defendant's profits to be awarded, Plaintiff has the initial burden of proving, by a preponderance of the evidence, Defendant's gross sales revenue resulting from the infringement.

Defendant then has the burden of proving, by a preponderance of the evidence, the amount of expenses that should be deducted from gross sales revenue to determine profit, and any portion of their profit they allege is attributable to factors other than use of the infringing trademark. Defendant may deduct any variable costs associated with manufacturing, marketing or providing the infringing service.

## INSTRUCTION NO. 22

### INTENTIONAL INFRINGEMENT

If you find that Defendant infringed Plaintiff's trademark, you must also determine whether it intentionally or willfully used the trademark to trade on the goodwill and/or reputation of Plaintiff.

## IV. DUTY TO DELIBERATE

It is now your duty to deliberate and to consult with one another in an effort to reach a verdict. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. During your deliberations, do not hesitate to re-examine your own opinions and change your mind if you are convinced that you were wrong. But do not give up on your honest beliefs because the other jurors think differently, or just to finish the case.

Remember at all times, you are the judges of the facts. You have been allowed to take notes during this trial. Any notes that you took during this trial are only aids to memory. If your memory differs from your notes, you should rely on your memory and not on the notes. The notes are not evidence. If you did not take notes, rely on your independent recollection of the evidence and do not be unduly influenced by the notes of other jurors. Notes are not entitled to greater weight than the recollection or impression of each juror about the testimony.

When you go into the jury room to deliberate, you may take with you a copy of this charge, the exhibits that I have admitted into evidence, and your notes. You must select a jury foreperson to guide you in your deliberations and to speak for you here in the courtroom.

Your verdict must be unanimous. After you have reached a unanimous verdict, your jury foreperson must fill out the answers to the written questions on the verdict form and sign and date it. After you have concluded your service and I have discharged the jury, you are not required to talk with anyone about the case.

If you need to communicate with me during your deliberations, the jury foreperson should write the inquiry and give it to the court security officer. After consulting with the attorneys, I will

19

respond either in writing or by meeting with you in the courtroom. Keep in mind, however, that you

must never disclose to anyone, not even to me, your numerical division on any question.

You may now proceed to the jury room to begin your deliberations.


**SIGNED** this _____ day of _____, 2022.


_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| REX REAL ESTATE I, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:19-CV-696-RP |
| | § | |
| REX REAL ESTATE EXCHANGE INC., | § | |
| | § | |
| Defendant. | § | |

**VERDICT FORM**

**QUESTION NO. 1**

Has Plaintiff proven that it possesses trademark rights in one or more of its asserted marks in connection with real estate brokerage services?

Answer "Yes" or "No":

Answer: _____

*If your answer to Question 1 is "yes," proceed to Question 2.*

**QUESTION NO. 2**

Has Plaintiff proven that it established its trademark rights prior to the date of first use by Defendant of those same terms in connection with real estate brokerage services?

Answer "Yes" or "No":

Answer: _____

*If your answer to Question 2 is "yes," proceed to Question 3.*

**QUESTION NO. 3**

Has Plaintiff proven that Defendant used its trademark without the consent of Plaintiff in a manner that is likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation, or approval of the services?

Answer "Yes" or "No":

Answer: _____

*If your answer to Question 3 is "yes," proceed to Question 4.*

### QUESTION NO. 4

Was the Defendant's infringement of Plaintiff's trademark rights willful?

Answer "Yes" or "No":

Answer: _____

*If your answer to Question 3 or 4 is "yes," proceed to Questions 5 and 6.*

### QUESTION NO. 5

What is the total amount of actual damages that should be awarded to Plaintiff as a result of Defendant's trademark infringement? Answer in dollars and cents.

Answer: $ _____

### QUESTION NO. 6

What is the total amount of Defendant's profits that are attributable to its infringement of Plaintiff's trademarks? Answer in dollars and cents.

Answer: $ _____

**SIGNED** this _____ day of _____, 2022.

_____
PRESIDING JUROR

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| REX REAL ESTATE I, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:19-CV-696-RP |
| | § | |
| REX REAL ESTATE EXCHANGE INC., | § | |
| | § | |
| Defendant. | § | |

**VERDICT FORM**

**QUESTION NO. 1**

Has Plaintiff proven that it possesses trademark rights in one or more of its asserted marks

in connection with real estate brokerage services?

Answer "Yes" or "No":

Answer: _____YES_____   Plaintiff has three federal registrations for the Asserted

Trademarks, one of which is incontestable, and two Texas registrations.

*If your answer to Question 1 is "yes," proceed to Question 2.*

**QUESTION NO. 2**

Has Plaintiff proven that it established its trademark rights prior to the date of first use by

Defendant of those same terms in connection with real estate brokerage services?

Answer "Yes" or "No":

Answer: _____YES_____   Plaintiff's registrations set forth a date of first use prior to the

date of first use by the Defendant.

*If your answer to Question 2 is "yes," proceed to Question 3.*

1

**QUESTION NO. 3**

Has Plaintiff proven that Defendant used its trademark without the consent of Plaintiff in a manner that is likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation, or approval of the services?

Answer "Yes" or "No":

Answer: _____YES_____        Plaintiff's expert Dr. Stec presented opinion testimony showing a likelihood of confusion.  Plaintiff also presented evidence of actual confusion.

*If your answer to Question 3 is "yes," proceed to Question 4.*


**QUESTION NO. 4**

Was the Defendant's infringement of Plaintiff's trademark rights willful?

Answer "Yes" or "No":

Answer: _____YES_____        See Section V(C) of Plaintiff's Brief.

*If your answer to Question 3 or 4 is "yes," proceed to Questions 5 and 6.*


**QUESTION NO. 5**

What is the total amount of actual damages that should be awarded to Plaintiff as a result of Defendant's trademark infringement? Answer in dollars and cents.

Answer: __$21,131,294__        This amount ranges from $600,927 to $21,131,294 see Sections V(A)(1) and V(A)(2) of Plaintiff's brief.


**QUESTION NO. 6**

What is the total amount of Defendant's profits that are attributable to its infringement of Plaintiff's trademarks? Answer in dollars and cents.

Answer: __$49,460,736__        This amount ranges from $2,100,203 to $49,460,736, see Sections V(A)(3) of Plaintiff's brief.

**SIGNED** this _____ day of _____, 2022.

_____
PRESIDING JUROR

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| REX REAL ESTATE I, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:19-cv-00696-RP-DH |
| | § | |
| REX REAL ESTATE EXCHANGE INC., | § | |
| | § | |
| Defendant. | § | |

## ORDER REVERSING THE COURT'S ORDER GRANTING DEFENDANT'S RULE 50(a) MOTION AND ENTERING JUDGMENT IN FAVOR OF PLAINTIFF

The Court having considered Defendant Rex Real Estate Exchange Inc.'s ("Defendant") oral arguments made at trial on April 12 and April 13, 2022 and its subsequent brief filed May 5, 2022, as well as Plaintiff Rex Real Estate I, L.P.'s ("Plaintiff") oral arguments made at trial on April 12 and April 13, 2022 and its opposition brief filed on May 13, 2022 is of the opinion that its previous April 13, 2022 Order granting Defendant's Rule 50(A) motion should be reversed.

IT IS THEREFORE ORDERED that the Court's April 13, 2022 Order is REVERSED, such that Defendant's motion is DENIED.

IT IS FURTHER ORDERED that judgment as a matter of law is GRANTED in favor of Plaintiff.

IT IS FURTHER ORDERED that Defendant, including its officers, agents, servants, employees, independent contractors, assigns, successors in interest, attorneys, and all persons acting in concert with them are hereby PERMANENTLY ENJOINED from and ORDERED to:

(i)        immediately cease the advertising, marketing, selling or rendering of any service under or otherwise using or continuing to use the REX and REX REAL ESTATE marks ("Marks"),

including immediately ceasing any use of the Marks in Defendant's domain names, as well as any other mark or domain name that is confusingly similar to the Marks;

(ii)     immediately cease representing to any other person or entity that Defendant has authority to use the Marks;

(iii)    immediately cease representing to any other person or entity that Defendant or its services are in any manner associated with, connected to, related to, sponsored by, affiliated with, endorsed by, approved by or recommended by Plaintiff;

(iv)     file Express Abandonment (Withdrawal) Of Application with the U.S. Patent and Trademark Office within seven (7) days from the date of this Order concerning each of Defendant's U.S. Service Mark Application Ser. Nos. 87/303,446 and 87/550,333;

(v)      assign ownership of Defendant's U.S. Registration No. 3,045,177 for the Marks to Plaintiff within seven (7) days from the date of this Order;

(vi)     assign ownership of Defendant's domain names that include the Marks to Plaintiff within seven (7) days from the date of this Order; and

(vii)    report to the Court within thirty (30) days of this Order of its compliance with this Order and Permanent Injunction.

IT IS FURTHER ORDERED that Defendant shall pay Plaintiff $21,131,294 in actual damages, $49,460,736 in lost profit damages, and Plaintiff's reasonable attorneys' fees incurred in prosecuting this action, along with any additional amounts that the Court determines to be just as well as any other relief to which Plaintiff may be justly entitled.

SIGNED ON this _____ day of _____, 2022.

_____
THE HONORABLE ROBERT PITMAN
UNITED STATES DISTRICT JUDGE